**STEENBERG CONSTRUCTION COMPANY, a corporation, and the Travelers Indemnity Company of Hartford, Connecticut, a corporation, Appellants,**

v.

**The PREPAKT CONCRETE COMPANY, a corporation, Insurance Company of North America, a corporation, and the U. S. A. for the Use and Benefit of the Prepakt Concrete Company, Appellees.**

**No. 9009.**

United States Court of Appeals
Tenth Circuit.

Aug. 3, 1967.

Rehearing Denied Sept. 6, 1967.

Ray G. Martineau and C. Keith Rooker, Salt Lake City, Utah (Clifford L. Ashton, of Van Cott, Bagley, Cornwall & Mc-Carthy, Salt Lake City, Utah, with them on brief), for appellant.

Bryce E. Roe, Salt Lake City, Utah (Stuart G. Oles, of Jones, Roe, Jerman & Dart, Salt Lake City, Utah, Allen, De-Garmo & Leedy, Seattle, Wash., with him on brief), for appellees.

Before MURRAH, Chief Judge, and PICKETT and BREITENSTEIN, Circuit Judges.

MURRAH, Chief Judge.

This suit is between a government prime contractor on a Utah dam project and a subcontractor for the drilling and grouting work on the dam foundation. The claim is for breach of the subcontract. The defense is that the standard

subcontract which the parties signed, never became operative, but if so, the subcontractor excusably abandoned it for failure of the contractor to do work prerequisite to the orderly performance of the subcontract. The cross-claim was cast under the Miller Act, Title 40 U.S.C. § 270a et seq., for the value of labor and materials furnished by the subcontractor in the prosecution of the prime contract. The statutory sureties are parties according to their respective interests.

This appeal is from a judgment holding that neither party was liable to the other for breach of contract, but that the subcontractor justifiably abandoned the contract and was, therefore, entitled to a judgment on its cross-claim against the contractor and its surety. We affirm the judgment (with slight modifications) but for reasons different than those inhering in the trial court's findings and conclusions.

The trial court's judgment rests upon the following basic facts: In June 1963, Steenberg contracted with the Bureau of Reclamation for the construction of an earthen dam on Lost Creek in Utah. The contract specified the excavation to bedrock of what is called a "core trench" 30 feet wide running the entire length of the dam, and a "grout trench" 3 feet deep and 3 feet wide in the center of the bedrock bottom of the core trench. The grout trench was then to be filled with concrete, and pipes placed upright according to a prescribed pattern. Prepakt, the subcontractor, agreed to drill through these upright pipes, through the concrete grout cap into the bedrock and render it impervious by pressure-pumping grouting material through the drill holes into the cracks and crevices of the bedrock. The core trench was then to be backfilled and covered with impervious material. The progress schedule prepared by the contractor and submitted to the Bureau contemplated that the stream would be diverted to the east side of the canyon for the excavation, drilling, grouting and filling of that portion of the core trench on the west side of the canyon, and that this part of the work would

be completed between September 1 and November 15, 1963, and that further drilling, grouting and filling would then be suspended for the winter and resumed in the spring, when the stream would be rediverted to the west side so that the same operations could be accomplished on the east side of the canyon. The subcontract mailed to Prepakt provided that the subcontract work was to be performed in "approximate accord with approved progress schedule presently scheduled for approximately September 1963." Upon receipt of the subcontract, Prepakt added the following typewritten words: "Progress schedule date to be mutually agreed upon in writing * * *." As thus modified the executed contract was returned to the contractor with a covering letter calling attention to the typewritten changes. The standard form subcontract obligated the subcontractor "To perform and coordinate his work with that of the Contractor and other subcontractors to the best interest of the project as a whole as directed by the Contractor * * To be bound to the Contractor by the terms of the General Contract, to conform to and comply with all of the terms of the General Contract and to assume toward the Contractor all of the duties and obligations that the Contractor assumes in the General Contract toward the Owner insofar as they are applicable to this Sub-contract unless changed in this Sub-contract."

The prime contract pertinently provided "The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (a) subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (b) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. * * * Any claim of the Contractor for adjustment hereunder shall not be allowed unless he has given notice as above required; or unless the Contracting Officer grants a further

period of time before the date of final payment under the contract. * * * "

The subcontract was thus integrated with the general contract, each of the parties agreeing to coordinate his work toward the performance of the obligations of the general contract.

Soon after the execution of the subcontract and about the middle of August 1963, representatives of Steenberg and Prepakt met at the dam site to get acquainted and to discuss the performance of the subcontract as an integral part of the prime contract. Prepakt's attention was called to a bar graph or progress schedule showing the work to be accomplished before the contemplated winter shutdown. It seemed to be understood in the conversations that there would be some delay in starting the drilling and grouting operations, but the parties discussed and understood the necessity of completing these operations before the scheduled winter shutdown about November 15. And, it seemed also understood that Prepakt would have sufficient time to perform the grouting and drilling operations between the middle of September and the 15th of November. The parties did not agree in writing on a progress schedule but Prepakt undertook to do the work under the subcontract in accordance with the progress schedule indicated on the bar graph. Prepakt mobilized its equipment at the dam site about the 1st of September and made ready to commence operations about September 15. Pursuant to a call from Steenberg, a Prepakt crew was sent to the site about September 21, but the grout cap was not ready for drilling and grouting operations and having nothing to do, the crew moved out about October 5.

The progress schedule prepared by the contractor and shown to the subcontractor at the August meeting was based upon the Bureau engineers' estimate that the maximum depth of the excavation of the core trench to bedrock would be approximately 28 feet. When, however, the excavation got under way sometime in September, it was soon discovered that the estimates of the depth to bedrock were erroneous; that instead it would be necessary to excavate approximately 68 feet to bedrock in some areas of the core trench.

Because of the specified sloping sides of the core trench, the additional depth of the excavation increased the width of the core trench at surface from approximately 120 feet to approximately 240 feet. This, of course, required restaking of the core trench by the Bureau engineers and it became apparent that the completion of the core trench would be delayed and that a revision of the progress schedule would be necessary. The contractor so notified the contracting officer who was undobtedly aware of the changed condition. The excavation of the core trench at the lower levels also created unanticipated water problems. A revised progress schedule reflecting the delay caused by the additional excavation was submitted to the Bureau about November 15.

In these circumstances representatives of Steenberg and Prepakt met again at the dam site on November 6 to discuss the problems wrought by the delay. Revision of the work schedule was discussed; the condition of the core trench and grout cap was surveyed; spring flooding and other water problems were also discussed. The bottom of the core trench had not been reached and the necessity for a revised schedule was recognized, though Steenberg did not inform Prepakt that a winter shutdown had been abandoned and a revised schedule had been or was about to be submitted to the Bureau.

After viewing conditions at the dam site, Prepakt reminded Steenberg that "We didn't have anything in our estimate or in our contract for winter work * * We had anticipated going by that schedule and being far enough ahead that we could close that job down as the progress chart shows * * * " but that " * * cold weather was coming on us and we had already spent the amount of money we had waiting and moving in and out and I felt we should have more money if they expected us to continue on through

the winter weather." The contractor did not agree to a revision of the contract price, but promised "to help in every way we can", including shelter, heat, lights and hot water; "Anything you want * * * because it is going to ruin us if we do not accomplish this work before the runoff."

The parties came to no definite understanding concerning the time or the conditions under which the grout work would be commenced, but Prepakt told Steenberg "We would work just as long as we can help them. I realized that they were in a rough situation * * * We would do everything we could to get that portion of the drilling completed."

Prepakt agreed to commence operations upon notification when the location was ready. They discussed the manner in which the drilling and grouting operations would be carried on and seemed to agree that operations should commence at the bottom of the core trench around Hole 58.

On November 10, Prepakt was notified that the core trench was in condition to permit commencement of operations. Operations did commence on or about November 20, but flooding water caused by pump trouble interfered with operations, especially in and around Hole 58 until about November 26.

It seems to be fairly certain that Steenberg continued to be plagued with water problems and the accumulation of foreign materials in the core trench. The subcontractor also encountered unanticipated difficulties at Hole 58. Winter set in with all the attendant hardships and difficulties incident to drilling and operating with circulating water on the slope of the canyon, at below-freezing temperature. Finally, about the time Steenberg got the core trench cleaned out so as to permit Prepakt's operations to go forward, Prepakt discontinued operations on the project about December 12 because of what it described to be insurmountable difficulties, and the trial court found to be " * * * so difficult, dangerous and economically unfeasible that defendant Prepakt was excused from any obligation it otherwise had to perform during the winter months."

There was conflicting testimony concerning whether the core trench was in condition to permit drilling and grouting operations when Prepakt stopped, but the trial court conclusively found that because of the delay resulting from engineering errors, Steenberg was unable to make ready enough area in the lower portion of the core trench to permit Prepakt to operate two drills at once as had been planned, and that the preparation of the lower portion of the core trench to permit operation of two drills was a condition for the winter, Prepakt informed continue operations. The court significantly found from conflicting evidence that when Prepakt discontinued operation for the winter, Prepakt informed Steenberg that it would cooperate in completing the work "If a satisfactory adjustment of the subcontract schedule of work and compensation could be agreed upon"; that between December 12, 1963, and February 1964, negotiations were carried on between the parties but they failed to agree on terms upon which Prepakt would resume drilling and grouting work; that in January, Steenberg had notified Prepakt that unless it returned to the project within four days and resumed around-the-clock operations, the subcontract would be terminated; and that on February 12, Prepakt finally abandoned the project, removed its supplies and equipment from the job site. The court finally found that Steenberg's ultimatum was unreasonable under the facts and circumstances and when Prepakt finally quit the job, it had no obligation to continue performance of the subcontract work.

The pretrial order stipulated that the only triable issues were:

"1. Whether or not Steenberg Construction Company had a duty to furnish the Prepakt Concrete Company with warm water, shelters and heat to assist it in the performance of grouting work on the Lost Creek Project during the winter of 1963–1964 and, if so, whether Steenberg Construction

Company tendered or provided such services to The Prepakt Concrete Company.

2. Whether or not the defendant The Prepakt Concrete Company had any duty to the plaintiff Steenberg Construction Company under the circumstances of this case to continue grouting work on the Lost Creek Project during the winter of 1963–1964.

3. Whether The Prepakt Concrete Company or Steenberg Construction Company, or both of them, breached the duties described in Paragraphs 1 and 2 above."

This pretrial order establishes the dimensions of our lawsuit. But, inherent in this statement of the case is the threshold issue whether a duty to perform devolved on Prepakt in the first place.

■ If, as Prepakt contends, the subcontract never became operative for failure of the parties to agree "in writing" on a progress schedule, and the Miller Act claim was timely filed, the judgment should be affirmed, for there seems to be no question of the value of the labor and materials furnished in the prosecution of the work. The subcontract did not become operative unless Prepakt waived the typewritten provision for a written progress schedule, for the typewritten provision undoubtedly prevails over all the general provisions of the subcontract. Century Refining Co. v. Hall, 10 Cir., 316 F.2d 15; Broderick Wood Products Co. v. United States, 10 Cir., 195 F.2d 433; 3 Corbin on Contracts, § 548. And, it is a condition of performance as to which the parties never agreed in writing. The trial court did not think Prepakt waived the typewritten provision. But, we think it did. A requirement for written agreements of this kind " * * * may be waived, modified or rescinded by a subsequent oral contract * * * " as evidenced by the conduct of the parties. J. T. Majors & Sons, Inc. v. Lippert Bros. Inc., 10 Cir., 263 F.2d 650, 654; Century Refining Co. v. Hall, supra. By executing the per-

formance bond, orally agreeing at the August meeting to perform the subcontract in accordance with the progress schedule indicated on the bar graph shown to it at that time, and subsequently mobilizing its men and equipment in readiness to commence the work, Prepakt effectively waived the requirement for a written work schedule.

Steenberg takes the position that Prepakt not only waived the provision for a progress schedule in writing, but by its conduct also agreed to perform the subcontract amenably and in coordination with the provisions of the general contract, including work schedules which might from time to time be revised and adopted as dictated by the exigencies of prevailing conditions. In support of this contention, it says that at the August meeting, Prepakt was advised of the delay caused by the engineering mistakes, and that the parties agreed to work out a mutually satisfactory progress schedule for the drilling and grouting work in conformity with a contemplated revised work schedule. If this is so, mere difficulty, hardship or economic unfeasibility of performance is no excuse for Prepakt's abandonment of the work. Barnard-Curtiss Co. v. Untied States, 10 Cir., 244 F.2d 565; Broderick Wood Products Co. v. United States, supra; Foster v. Atlantic Refining Co., 5 Cir., 329 F.2d 485; Fritz-Rumer-Cooke Co. v. United States, 6 Cir., 279 F.2d 200; 6 Corbin on Contracts, § 1322; Annot. Contract-Performance-Impossibility, 84 A.L.R.2d 12, § 3 [c], and cases cited. Prepakt makes no contention that performance was impossible. And see generally Annot. 84 A.R.L.2d 12, supra. Indeed, the proof is that by winterizing the operation at a cost of approximately $10,000, the subcontracted work could have been continued during the winter months.

■ The flaw in Steenberg's contention is that its factual premise is unsupported by the evidence. We can find nothing in the record from which it can be inferred that Prepakt was informed in August of any significant delay which would require a revision of the progress

schedule. On the contrary, the evidence is clear that when the parties met at the dam site in August to discuss performance of the subcontract, Prepakt was shown the bar graph plainly indicating the grouting work would be commenced in September and finished before the mid-November winter shutdown. Prepakt painstakingly reserved the right to insist on a progress schedule in writing. And it agreed to waive that right only with the understanding that its work would be performed in accordance with the schedule depicted by the bar graph. Cf. Western Transmission Corp. v. Colorado Mainline, Inc., 10 Cir., 376 F.2d 470. Implicit in this agreement was the understanding that all conditions precedent to the performance of the drilling and grouting would be fully met, i. e. Prepakt would be provided a suitable place to commence and complete the work within the time contemplated by the bar graph schedule. Having undertaken to perform strictly in accordance with the August work schedule, Prepakt is entitled to the benefit of its bargain. It was indisputably prevented from commencing operations until about the time they were scheduled to be completed. In situations like this performance by the contractor of his end of the bargain is a constructive condition precedent to the duty of the subcontractor to perform his part of the bargain. See Ace Construction Co. v. W. H. Nichols & Co., 10 Cir., 353 F.2d 110, citing 3A Corbin on Contracts, § 700; Fritz-Rumer-Cooke Co. v. United States, supra. And this is so we think even though performance of the condition precedent was frustrated through no fault of the contractor.

█ █ It is thus clear to us that when the parties met again at the dam site on November 6, the condition precedent to Prepakt's performance had not and could not be met within the time contemplated by the August agreement, and Prepakt was therefore under no obligation to do anything. After canvassing the situation, Prepakt stood on its bargain and asked for more money. Steenberg refused, but agreed to winterize and at least impliedly agreed to provide a suitable place to do the grouting work. Prepakt agreed to do everything it could to complete the work, and to commence upon notification that the site was ready. It was notified; it did move in and commence operations; and it seems fair to say, as did the trial court, that it was prevented from continuing by intolerable weather conditions, and Steenberg's failure to winterize and otherwise provide a suitable place in which to perform the work. Steenberg seems to think that Prepakt was obligated to winterize and continue the work at all costs. But again applying the principle of Ace Construction Co. v. W. H. Nichols & Co., supra, we think the obligation ran the other way. Steenberg's failure to perform justified Prepakt's discontinuance of operations in December and ultimate abandonment of the contract in February.

█ Steenberg denies that the Miller Act claim was timely commenced, i. e. one year from the date on which the last labor was performed or material supplied by Prepakt. See 40 U.S.C. § 270b. The counterclaim and cross-claim were filed on December 16, 1965. Steenberg contends that the last labor was performed or material supplied a little over one year before the claim was filed. But, according to the credited findings of the trial court, Prepakt abandoned the project about ten months before the claim was filed when it removed its supplies, material and equipment from the project site in February 1964. The contract and subcontract both provided for a lump sum price for mobilization and demobilization for the drilling and grouting work. In these circumstances, we cannot say that demobilization was not labor performed by Prepakt on the project within a year prior to the filing of the counterclaim.

█ Steenberg's surety complains of the allowance of interest on the judgment from the date Prepakt abandoned the project on February 14, 1964. Under applicable Utah law, interest on the judgment against the surety is allowable

only from the date of the demand. See Golden West Construction Co. v. United States, 10 Cir., 304 F.2d 753, 757. There is no evidence that any demand was made upon the surety until the day of the filing of the counterclaim on December 16, 1964. Prepakt suggests that this point cannot be raised for the first time on appeal. But, the counterclaim demanded interest only "as provided by law". There is nothing in the record to indicate that the matter of interest was ever raised in the trial of the case and it did not become the subject of controversy until the judgment appealed from was rendered. In any event, we think the allowance of interest from February 14, 1964, was clearly erroneous.

The judgment against Steenberg is affirmed. The judgment against the surety is modified to allow interest from the date of the filing of the suit, December 16, 1964. As so modified, the judgment is affirmed.