510 F.Supp. 933 (1981)
UNITED STATES of America, etc., Plaintiff,
v.
HANKINS CONSTRUCTION CO., et al., Defendants.
No. 78-334C(2).
United States District Court, E. D. Missouri, E. D.
March 30, 1981.
*934 Richard Wolff, Clayton, Mo., for plaintiff.
J. Dennis O'Leary, Dubail, Judge, Kilker & Maier, St. Louis, Mo., and Theodore C. Traeger, Clayton, Mo., for Hankins Construction Co. & U. S. Fidelity & Guaranty Co.
Edward M. Goldenhersh, Sidel, Sandweiss & Kaskowitz, St. Louis, Mo., for Maryland & Brunson Construction Corp.
Richard Wolff, St. Louis, Mo., for National Bonding & Ins. Co. & Robert & Gloria Schall.

MEMORANDUM
NANGLE, District Judge.
This case is now before the Court for decision upon the merits. Plaintiff brought this suit pursuant to the Miller Act, 40 U.S.C. §§ 270a and 270b, seeking to recover sums allegedly due and owing on grading and seeding subcontracts. Plaintiff also seeks a declaration that a promissory note given to defendant has been satisfied by a credit given to defendant on the amount owing under the above grading subcontract. Defendant has counterclaimed, seeking damages for plaintiff's alleged breach of the above subcontracts, as well as seeking to collect the above-mentioned promissory note.
This case was tried before the Court sitting without a jury. This Court, having considered the pleadings, the testimony of *935 the witnesses, and the documents and depositions in evidence, and being fully advised in the premises, hereby makes the following Findings of Fact and Conclusions of Law, as required by Rule 52, Federal Rules of Civil Procedure.

FINDINGS OF FACT
Plaintiff Suburban Tree Service, Inc. (Suburban) and defendant Hankins Construction Company (Hankins) are Missouri corporations, duly registered and transacting business in that state. Defendant United States Fidelity and Guarantee Company (U.S.F. & G.) is a Maryland corporation. Counter-defendants Robert and Gloria Schall are individuals residing in Missouri, and are officers and directors of plaintiff.
On June 10, 1976, Hankins entered into a written contract with the United States of America, acting by and through the Department of the Army and the Corps of Engineers (the Corps), for the construction of improvements at Fort Leonard Wood in southern Missouri.[1] The project was referred to as the Ammunition Storage Facilities project. As a condition of the contract, Hankins was required to execute and deliver a payment bond for the benefit of persons supplying labor and materials in the prosecution of the work provided for in the contract. Hankins obtained such a bond from defendant U.S.F. & G.[2]

THE GRADING SUBCONTRACT
On June 30, 1976, defendant entered into a subcontract with Brunson Construction Corporation (Brunson), formerly a defendant herein, wherein Brunson was to perform the environmental protection, and grading, excavating, filling and backfilling portions of the project (the grading subcontract). Brunson was to be paid the lump sum of three hundred thousand dollars ($300,000.00) for this work. On that same date, Brunson, in turn, sub-subcontracted this work to plaintiff for the lump sum of one hundred forty-eight thousand six hundred dollars ($148,600.00).[2a]
Plaintiff commenced work on this project on or about July 19, 1976. Though progress was slowed somewhat by the unexpected presence of large amounts of uncharted rock, plaintiff was satisfactorily progressing until the onset of winter. At that time, work was discontinued due to severe weather conditions. Plaintiff resumed work on the project in the spring. During these periods, Brunson performed only a minimal amount of supervisory work. All the actual labor on the Brunson-Hankins subcontract was performed by Suburban pursuant to the Brunson-Suburban sub-subcontract. In the spring, a dispute arose between plaintiff and Brunson as to the amount of work plaintiff had completed and its entitlement to payment therefor.
Matters eventually came to a head on May 16, 1977. Plaintiff had informed Brunson that unless plaintiff was paid a substantial sum prior to that date, plaintiff would pull off the job. When not paid, plaintiff did so. Brunson then fired plaintiff, thus terminating the sub-subcontract between those parties. Plaintiff had been paid by Brunson up to this time a total of eighty-one thousand five hundred fifty-seven dollars ($81,557.00).
Plaintiff immediately contacted Hankins and informed it of what had transpired. Plaintiff told Hankins that the subcontract was eighty percent complete, and expressed the fear that Brunson would hire someone at an exorbitant rate to complete the small amount of work remaining, thereby harming plaintiff's chances of recovering the *936 money owed it. The parties discussed the possibility of Suburban taking over the Brunson subcontract.
The parties are in sharp dispute as to the agreement eventually reached. On the basis of all the credible evidence, this Court believes the agreement reached is as follows: Brunson would be fired by Hankins, and Suburban would be hired to complete the subcontract. Suburban would be paid on a "machine time" basis, with a maximum payment of the amount still owning to Suburban on the Brunson sub-subcontract  sixty-seven thousand forty-three dollars ($67,043.00). Hankins agreed to advance Suburban thirty thousand dollars ($30,000.00), since Suburban was short on operating funds. Suburban, and Robert and Gloria Schall individually, would sign a promissory note evidencing this advance. This note would subsequently be cancelled upon completion of the work.
In accordance with this agreement, Hankins fired Brunson on May 16, 1977. Hankins has subsequently paid Brunson the amount outstanding on the three hundred thousand dollar subcontract, less amounts sufficient to cover backcharges and an amount equal to that outstanding on the Brunson-Suburban sub-subcontract. Hankins also advanced Suburban thirty thousand dollars that day, and a promissory note evidencing that advance was signed the next day by Robert and Gloria Schall individually, and by Robert Schall on behalf of Suburban. Suburban returned to work on the project on May 17, 1977.
Suburban worked on the grading subcontract until October 14, 1977, when it pulled off the job. The contract was substantially completed at that time, though further work was subsequently necessary on Hankins' part to bring the project into compliance with the Corps' specifications.
During this time period, plaintiff expended machine time which exceeded the amount remaining on the Brunson-Suburban sub-subcontract. The most reliable records of the amounts of time expended by plaintiff are defendant's daily time sheets (Exhibits V through V-6). These time sheets indicate that plaintiff's machinery was used in the following amounts on the basic grading contract:

D7E Dozer 777 hours
Wabco Scraper 282 hours
544 Payloader 341 hours
International 250C 4 hours
310 Backhoe 80 hours
760 Scraper 74 hours.

A reasonable hourly charge for each of the above machines is forty-eight dollars ($48.00) per hour for the D7E Dozer, sixty dollars ($60.00) per hour for the Wabco scraper, thirty dollars ($30.00) per hour for the 544 Payloader, thirty-nine dollars ($39.00) per hour for the International 250C, twenty-five dollars ($25.00) per hour for the 310 Backhoe, and twenty-five dollars ($25.00) per hour for the 760 Scraper. Plaintiff therefore expended sixty-eight thousand four hundred fifty two dollars ($68,452.00) in machine time on the basic grading contract, an amount in excess of the maximum allowable under the parties' agreement.
Plaintiff also performed certain extra work at the specific request and instruction of Hankins. The most significant of this work involved the modification of certain culverts. In connection with this work, plaintiff was required to move approximately six thousand cubic yards of fill. A reasonable charge for this work is twelve thousand dollars ($12,000.00). Defendant has already paid plaintiff five hundred thirty-one dollars ($531.00) for work on this modification, as evidenced by plaintiff's invoice of August 16, 1977, leaving a balance due of eleven thousand four hundred sixty-nine dollars ($11,469.00).[3]
Suburban was required to clear trees and move chip piles for surveyors. Though this work would eventually have to have been done by Suburban, doing it at the specific *937 time requested by Hankins required extra work by plaintiff. A reasonable charge for this extra work is one thousand four hundred seventy-five dollars ($1,475.00).
Suburban was required at various times to load and move a small building for Hankins. A reasonable charge for this work is four hundred eighty-five dollars ($485.00). Plaintiff also loaded other equipment for Hankins on several occasions. A reasonable charge for this work is eighty dollars ($80.00).
Plaintiff was required to install culverts due to a modification in the work. A reasonable charge for this extra work is two thousand eight hundred eleven dollars ($2,811.00). Plaintiff was required to grade base rock in front of the ammunition bunkers. A reasonable charge for this work is three hundred eighty-five dollars ($385.00).
Hankins used one of plaintiff's employees one day. A reasonable charge for his services is one hundred thirty dollars ($130.00). Plaintiff was required to build ramps for concrete trucks. A reasonable charge for this work is eight hundred dollars ($800.00). Plaintiff was also required to backfill the septic system and plumbers' ditches, to furnish on-site transportation utilized by Hankins' employees, and to furnish ice on the site during the summer. Reasonable charges for these services are two hundred seventy dollars ($270.00), four hundred fifty dollars ($450.00), and twenty-five dollars ($25.00), respectively. Finally, plaintiff supplied a compactor for use by Hankins' employees. A reasonable charge for use of this compactor is seven hundred dollars ($700.00).
There is no evidence that plaintiff was improperly charged by Hankins for an operator of a motor grader. Likewise, though plaintiff was required to remove telephone lines and poles, this work was within the original contract specifications, and though plaintiff was required to load debris left by brick layers, it has been paid for this work, as evidenced in its August 16, 1977 invoice and the accompanying lien waiver. The total amount owing and unpaid for work performed by plaintiff at defendant's request which was not within the original contract specifications is nineteen thousand eighty dollars ($19,080.00).
As stated earlier, Hankins paid Suburban thirty thousand dollars on the contract on May 16, 1977. Further payments of ten thousand dollars ($10,000.00), twenty thousand dollars ($20,000.00) and sixty-five hundred dollars ($6500.00) were made on June 30, July 14, and August 18, 1977, respectively.
While Suburban was working on the grading contract, Hankins supplied Suburban with excavating services, laborers, and the use of its telephone. Reasonable charges for these items total twelve thousand eight hundred twenty-nine dollars and thirty cents ($12,829.30).
After Suburban left the job in October 1977, some grading, excavating and backfilling remained to be done. Some areas were not properly graded, and large rocks and trees and logs had not been properly disposed of. Some ravines and ditches were not properly cut and did not drain properly. Stumps in some areas were too high and had to be cut closer to the ground. Hankins was required to do this work in order that the project would meet with Corps' approval. The reasonable value of the work done by Hankins in completing the Suburban subcontract was thirteen thousand sixteen dollars and forty-eight cents ($13,016.48).

THE SEEDING SUBCONTRACT
On June 22, 1977, Hankins and Suburban executed a subcontract whereby Suburban agreed to perform the seeding portion of the Ammunition Storage Facilities project. Plaintiff was to be paid a lump sum of sixty-one thousand dollars ($61,000.00) for its work on this portion of the contract. By the time negotiations began for this subcontract, plaintiff was well aware of the soil conditions at the project site, the most significant of which was that the area was very rocky. Nevertheless, plaintiff undertook to grow grass in the area.
*938 Plaintiff commenced work on the seeding subcontract in mid-August 1977, after most of the work on the grading subcontract was complete. As might be expected, the task of growing grass in this rocky soil proved quite difficult. The Corps' specifications provided that no grass could be planted after October 10. Plaintiff therefore quit work on the seeding contract shortly after that date, intending to return in the spring.
At the time plaintiff quit seeding for the winter, the work on the seeding subcontract was unacceptable to the Corps. Grass was actually growing in only limited areas, and seed had been applied indiscriminately in many areas which had not been properly prepared. Many areas had not been properly fertilized and the wood chips had not been properly distributed or disced.
Despite this obvious state of inadequacy, plaintiff sent Hankins a bill on October 21, 1977, seeking payment for eighty percent completion of the seeding contract. In a subsequent letter by plaintiff's attorney to Hankins, the claim was reiterated that eighty percent of the work had been completed. Plaintiff refused to return in the spring unless paid accordingly.
Hankins refused to accede to plaintiff's demand, since the seeding contract was obviously not eighty percent completed. Plaintiff therefore refused to return to the job in the spring and Hankins was forced to perform the seeding contract to the satisfaction of the Corps with its own laborers and hired help. Likewise, Hankins was forced to pay for all supplies itself.
Due to the difficulty of obtaining a satisfactory stand of grass, the costs incurred by Hankins in completing the seeding contract were well in excess of what had been expected. After Suburban left the job, Hankins incurred costs totalling sixty nine thousand four hundred twenty-seven dollars and seventy-five cents ($69,427.75). The labor and supplies expended by Hankins in completion of the seeding contract to the Corps' satisfaction were all necessary and proper for that purpose. The prices charged were fair and reasonable.
Prior to the time Suburban left the job, Hankins had purchased certain supplies and services on Suburban's behalf, and had supplied laborers who worked for Suburban. A reasonable charge for these supplies, services, and laborers is fifteen thousand seven hundred sixty-three dollars and two cents ($15,763.02).
Plaintiff last furnished labor or materials for the Ammunition Storage Facilities project on October 14, 1977. This suit was commenced more than ninety days and less than a year from that date.

CONCLUSIONS OF LAW
This Court has jurisdiction of this cause of action pursuant to 40 U.S.C. § 270b(b). Plaintiff seeks to recover funds allegedly due and owing on its subcontracts with defendant, who contracted with the United States government and furnished a payment bond pursuant to 40 U.S.C. § 270a. This suit was timely filed. See 40 U.S.C. § 270b.
In Count I of plaintiff's complaint, plaintiff seeks to recover amounts allegedly due and owing on the basic grading subcontract. In Count II, plaintiff seeks to recover for extras performed on this subcontract at defendant's request. Conversely, in Count I of its counterclaim, Hankins seeks to recover damages for plaintiff's alleged breach of the grading subcontract. These counts will be dealt with together.
Under the terms of the subcontract agreed upon orally between the parties on May 16, 1977, plaintiff is entitled to receive the lesser of the amount remaining on the Brunson-Suburban sub-subcontract or that earned on the basis of machine time. The former proved to be the lesser of these amounts. Plaintiff is also entitled to recover the reasonable value of extra services or materials provided at defendant's request. Julian v. Kiefer, 382 S.W.2d 723 (Mo.App. 1964).
Plaintiff, however, did not totally complete its obligations under the grading subcontract. Defendant, therefore, is entitled *939 to deduct from the amount owing plaintiff the amount reasonably required to complete the contract. Forsythe v. Starnes, 554 S.W.2d 100 (Mo.App.1977); Julian, supra; National Union F. Ins. Co. of Pittsburg, Pa. v. D & L Const. Co., 353 F.2d 169 (8th Cir. 1965), Dale Benz, Inc., Contractors v. American Casualty Co., 303 F.2d 80 (9th Cir. 1962). Taking into account the amount remaining on the Brunson-Suburban sub-subcontract,[4] the reasonable value of extras furnished by Suburban,[5] the payments made by Hankins to Suburban in the way of advances,[6] cash payments[7] and laborers and materials supplied,[8] and the reasonable cost to Hankins of completing the grading subcontract after plaintiff left the job,[9] the net result is that plaintiff owes defendant six thousand two hundred twenty-two dollars and seventy-eight cents ($6,222.78).[10] Judgment will be entered accordingly.
In Count III of plaintiff's complaint, plaintiff seeks to have the promissory note executed by plaintiff and the Schalls declared void, on the ground that it has been satisfied by plaintiff's performance with respect to the grading subcontract. Conversely, defendant, in Count II of its counterclaim, alleges that this note is valid and unpaid and seeks to collect the principal amount plus interest and attorneys' fees.
This Court has found that plaintiff properly credited the promissory note against the amounts due on the grading subcontract. Such was intended by the parties when the note was executed. The note has therefore been satisfied, and a declaratory judgment will be entered to that effect, and defendant will be ordered to return the note to plaintiff. Judgment will therefore be entered in plaintiff's and counter-defendants' favor on Count II of defendant's counterclaim.
In Count IV of its complaint, plaintiff seeks to recover for the work done on the seeding subcontract. Conversely, in Count III of its counterclaim, defendant alleges that plaintiff breached the seeding subcontract and seeks to recover damages arising from that breach. This Court must agree with defendant that plaintiff breached the seeding subcontract. Plaintiff refused to return to complete its work in the spring of 1978 unless its demand for eighty percent payment was met, a demand plaintiff had no right to make. Plaintiff had not completed anything approaching eighty percent of the job, and its demand for payment was totally unjustified. Defendant was well within its rights in refusing to pay this amount. Rexite Casting Co. v. Midwest Mower Co., 267 S.W.2d 327 (Mo.App. 1954). Plaintiff therefore breached the subcontract by refusing to return in the spring. Cf. Cork Plumbing Co. v. Martin Bloom Associates, 573 S.W.2d 947 (Mo.App. 1978).
Undoubtedly, the seeding subcontract proved more difficult to satisfactorily fulfill than plaintiff had anticipated. Plaintiff was well aware of the conditions it would encounter before it entered into the subcontract, however. Under these circumstances, these difficulties did not justify plaintiff's breach of the subcontract. Steenberg Construction Co. v. Prepakt Concrete Co., 381 F.2d 768 (10th Cir. 1967); Cave Construction, Inc. v. United States, 387 F.2d 760 (10th Cir. 1967).
Defendant is therefore entitled to the amounts it reasonably expended in completion of the subcontract,[11] less the amounts *940 not paid to plaintiff.[12]National Union F. Ins. Co., supra; Edmonds v. Stratton, 457 S.W.2d 228 (Mo.App.1970); Forsythe v. Starnes, supra. Judgment will therefore be entered in defendant's favor in the amount of twenty-four thousand one hundred ninety dollars and seventy-seven cents ($24,190.77). That it eventually cost much more to complete the seeding contract than originally anticipated does not aid plaintiff. This was not a case of "economic waste," where repairs would necessitate the destruction of usable property, and the exception to the usual measure of damages in such cases is therefore not applicable. Cf. Ribando v. Sullivan, 588 S.W.2d 120 (Mo. App.1979); Forsythe v. Starnes, supra. Rather, it merely proved to be much more difficult to grow grass on the project than plaintiff had expected, and therefore cost more to do so. These expenses should be borne by plaintiff, however, since defendant hired plaintiff to complete the job. National Union Fire Ins. Co., supra.
Finally, defendant seeks to recover its attorneys' fees in connection with the seeding subcontract claims. That subcontract provides that Suburban shall indemnify Hankins for any attorneys' fees arising out of a breach thereof. Such a provision is clearly justification for an award of attorneys' fees herein. F. D. Rich Co. v. Industrial Lumber Co., 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974); United States, Etc. v. Community Science Tech., 574 F.2d 1292 (5th Cir. 1978); Dale Benz, supra.
Such an award, however, is in the discretion of this Court. United States v. Mountain States Const. Co., 588 F.2d 259 (9th Cir. 1978). Though this opinion has treated the grading and seeding subcontracts separately, in reality no such easy division was possible. The subcontracts were dealt with in unison by the parties, and the work on each was necessarily intertwined with the work on the other. Though defendant ultimately prevailed on the claims relating to the seeding subcontract, no such winner is evident with respect to the grading subcontract. Also closely interrelated to both contracts was the promissory note which was the subject of claims by both parties. As to these claims, plaintiff prevailed. Under these circumstances, this Court believes it would be inequitable to award defendant its counsel fees. Defendant "prevailed," but only by ignoring the results in these closely interrelated claims.
NOTES
[1] Fort Leonard Wood is located in both the Eastern and Western Districts of Missouri, and the work in question was performed in both districts. The parties stipulated prior to trial that venue was proper in this district.
[2] U.S.F. & G. is a defendant herein due to its status as Hankins' surety, not due to any substantive acts on its part. When used in this opinion, unless specified otherwise, the term "defendant" will refer to Hankins.
[2a] No one explained how Brunson worked out an arrangement so beneficial to itself, but it is obvious that, from the beginning, plaintiff underestimated the work required of plaintiff on this job.
[3] Hankins has admitted that it has failed to pay Suburban two thousand one hundred forty-five dollars ($2,145.00) for unbilled extras. This Court understands this amount to be included within Suburban's claim for the above-mentioned culvert extension.
[4] $67,043.00
[5] $19,080.00
[6] $30,000.00
[7] $36,500.00
[8] $12,829.30
[9] $13,016.48
[10] This Court does not believe defendant is entitled to recover an amount representing overhead and profit on the completion of the grading subcontract, as defendant seeks. Dale Benz, supra. The same is true with respect to defendant's attempt to recover such amounts on the seeding subcontract.
[11] $69,427.75
[12] Defendant expended $15,763.02 on plaintiff's behalf while plaintiff was still on the job. Subtracting this amount from the contract price, $61,000.00, leaves the amount not paid to plaintiff  $45,236.98.