834 F.2d 1533
 34 Cont.Cas.Fed. (CCH) 75,407
 The UNITED STATES of America, for the Use of C.J.C., INC., a
New Mexico corporation, Plaintiff-Appellee,
v.
WESTERN STATES MECHANICAL CONTRACTORS, INC., a New Mexico
corporation; Commercial Union Insurance Co., a
Massachusetts corporation; and Sandia Corporation, a New
Mexico corporation, d/b/a Sandia National Laboratories,
Defendants-Appellants.
UNITED STATES of America, for the Use of HUGG SURVEYING CO.,
Plaintiff- Appellee,
v.
WESTERN STATES MECHANICAL CONTRACTORS, INC., a New Mexico
corporation; and Commercial Union Insurance Co.,
a Massachusetts corporation, Defendants-
Appellants.
UNITED STATES of America, for the Use of HUGG SURVEYING CO.,
Plaintiff- Appellant,
v.
WESTERN STATES MECHANICAL CONTRACTORS, INC., a New Mexico
corporation; and Commercial Union Insurance Co.,
a Massachusetts corporation, Defendants-
Appellees.
The UNITED STATES of America, for the Use of C.J.C., INC., a
New Mexico corporation, Plaintiff-Appellant,
v.
WESTERN STATES MECHANICAL CONTRACTORS, INC., a New Mexico
corporation; and Commercial Union Insurance Co.,
a Massachusetts corporation, Defendants-
Appellees.
UNITED STATES of America, for the Use of FRED SANCHEZ
CONSTRUCTION COMPANY, Plaintiff-Appellee,
v.
WESTERN STATES MECHANICAL CONTRACTORS, INC., a New Mexico
corporation; and Commercial Union Insurance
Co., a Massachusetts corporation,
Defendants- Appellants.
 Nos. 84-1682, 84-1707 to 84-1709 and 84-1758.
 United States Court of Appeals,
Tenth Circuit.
 Nov. 30, 1987.
 
 Robert N. Singer (Barry D. Williams with him on the briefs), Singer, Smith & Williams, P.A., Albuquerque, N.M., for plaintiffs-appellants, C.J.C., Inc. and Hugg Surveying Co.
 Tibo J. Chavez, Jr., Belen, N.M., for plaintiff-appellant, Fred Sanchez Const. Co.
 Robert G. Kavanagh (Martin E. Threet with him on the briefs), Threet & King, Albuquerque, N.M., for defendants-appellees, Western States Mechanical Contractors, Inc.
 Before MOORE, McWILLIAMS and ANDERSON, Circuit Judges.
 STEPHEN H. ANDERSON, Circuit Judge.
 
 I. Summary
 
 1
 These consolidated actions were brought by subcontractors against the prime contractor Western States Mechanical Contractors, Inc. ("Western") and its bonding company, seeking, inter alia, contract and quantum meruit damages relating to their work on construction of a live fire range at Kirtland Air Force Base, New Mexico. The project involved federal contracts. The claims, therefore, proceed under the Miller Act, as amended. 40 U.S.C. Secs. 270a-270d (1982).
 
 
 2
 Following a trial to the court, the district court entered judgment against Western and its surety in the following amounts for each subcontractor: Fred Sanchez Construction Co. ("Sanchez"), $190,000.00 for the value of work performed, less prior payments and the cost of correcting construction errors by Sanchez (for a total award of $3,774.67); C.J.C., Inc. ("CJC"), $160,384.27 in quantum meruit damages for the value of work performed; and Hugg Surveying Co. ("Hugg"), $11,208.40 pursuant to Hugg's subcontract with Western, plus interest and $4,885.37 in attorneys' fees. Western's cross-complaints for damages and set-off were all dismissed.
 
 
 3
 Sanchez, CJC and Hugg appeal on various grounds. Sanchez contends its award was inadequate and also appeals the denial of prejudgment interest, and attorneys' fees. CJC appeals the denial of punitive damages, consequential damages, prejudgment interest, and attorneys' fees. Hugg appeals only from the award of attorneys' fees, claiming that the award was inadequate because it was calculated under an erroneous standard.
 
 
 4
 Western appeals from the judgments for CJC and Hugg. As to CJC, Western contends it did not breach its contract, and that CJC is liable to Western for wrongfully leaving the project. Alternatively, Western argues that the district court improperly calculated the reasonable value of CJC's work. As to Hugg, Western contends the district court erred by including in the contract certain engineering and staking work. It also appeals the denial of claims for set-off.
 
 
 5
 We largely affirm the district court. We reverse the denial of prejudgment interest to CJC and remand the issue of Hugg's attorneys' fees for further consideration under a different standard.II. Background
 
 
 6
 In March, 1982, Western signed a contract with Sandia National Laboratories ("Sandia") for the construction of a live fire range, buildings and utilities on property owned by the United States at Kirtland Air Force Base, New Mexico. The total amount of the prime contract was $798,898.00. Work was to be completed by September 30, 1982. Pursuant to the prime contract Western and Commercial Union Insurance Co., ("Commercial Union") as surety, delivered a payment bond for the protection of all persons supplying labor or material in the performance of work under the prime contract in accordance with the requirements of the Miller Act. 40 U.S.C. Sec. 270a (1982). The Miller Act requires prime contractors on major federal construction projects to post a payment bond to protect subcontractors and materialmen.[1]
 
 A. Sanchez
 
 7
 In April, 1982, Western entered into a written subcontract with Sanchez, as a subcontractor for the earthwork portion of the project. The amount of the Sanchez subcontract was $295,706.00 and provided that Sanchez would also supply the engineering and surveying required to perform the earthwork.
 
 
 8
 Sanchez was the low bidder for the earthwork. Western, in preparing its bid for the prime contract, estimated that the earthwork portion of the contract would cost over $550,000.00, but that estimate included some work not covered by the Sanchez subcontract. Based on Western's bid, the trial court found that the reasonable value of the work to be performed under the Sanchez subcontract was $475,000.00. The court also concluded that Sanchez grossly underbid the value of the services to be performed under the subcontract. Had Sanchez completed the contract, it would have sustained substantial losses.
 
 
 9
 Sanchez commenced work on the subcontract on or about April 12, 1982. By mid-June, the earthwork portion of the contract was significantly behind schedule. However, the trial court found that Sanchez was prevented from proceeding on schedule by two developments beyond its control. First, Sandia personnel, with concurrence by Western, altered the order of the earthwork. Second, the plans for the project substantially underestimated the amount of rock excavation required. In July, Western and Sandia discovered major errors in the earthwork completed by Sanchez. On July 22, 1982, Western terminated the Sanchez subcontract and ordered Sanchez off the project site; Sanchez was given no opportunity to correct the errors. After considering the reasons for the delay, the trial court found that Sanchez was performing in a reasonable manner and that the termination by Western was wrongful and in breach of the subcontract.
 
 
 10
 Resolving conflicting estimates and testimony, the trial court concluded that Sanchez had completed 40% of the earthwork required under the subcontract when wrongfully terminated. Accordingly, the court awarded Sanchez, on a quantum meruit basis, 40% of the reasonable value of the earthwork ($475,000.00), or $190,000.00. However, the court also deducted $40,000.00 from the award as the cost of correcting construction errors by Sanchez.
 
 B. CJC
 
 11
 Shortly before terminating Sanchez, Western began negotiating with CJC to replace Sanchez and complete the earthwork. In negotiating with CJC, Western represented that Sanchez had completed more than 50% of the earthwork and did not fully disclose the number or magnitude of the errors by Sanchez. After Western terminated Sanchez, it signed a written subcontract with CJC for the completion of certain items of earthwork left undone by Sanchez. Under the CJC subcontract, work was to be performed on an hourly basis, based on the equipment used by CJC. The subcontract included a $150,000.00 cap and a provision holding CJC harmless and free of all liabilities or deficiencies created by the prior earthmoving subcontractor. The trial court found that the CJC subcontract was limited in scope and did not call for general corrective work or for rebuilding improperly placed earthwork berms. The trial court also found that the CJC subcontract did not require CJC to provide engineering and surveying in connection with the earthwork. That task remained the responsibility of Western.
 
 
 12
 CJC's work was also delayed and complicated by several factors beyond its control. First, Western represented that Sanchez had been terminated and removed from the project site. In fact, Sanchez remained on site for more than a week after the CJC subcontract was signed. Second, the engineering and setting of survey stakes was delayed, further delaying CJC. Third, additional errors in the work by Sanchez were discovered which required extra time and work by CJC. Finally, the trial court found that Sanchez, CJC, and other subcontractors were delayed and hindered in their progress by the failure of Western to provide regular and consistent supervision of the project and to have qualified and competent supervisory personnel on site during construction.
 
 
 13
 The CJC subcontract called for payment by Western of weekly invoices submitted by CJC, such payments to be made no later than the 15th day of the following month. CJC submitted invoices for July and August, 1982 but was not paid for those invoices. CJC also submitted invoices for work performed during August, but was not paid by September 15, 1982. On September 17, 1982, CJC had received no payment for the work performed for Western. After notice to Western, CJC terminated work on the project and removed its men and equipment from the site. Sandia and Western had expressed continuing concerns about delays in the earthwork, but had never expressed any dissatisfaction with the quality of CJC's work.
 
 
 14
 Subsequently, Western hired a third earthmoving subcontractor, Clayton Metcalf, to complete the work. Metcalf required fifteen weeks to finish the project and Western paid Metcalf $135,000.00. The entire project was completed in early 1983, several months behind schedule. Western was not financially penalized for the delay and was paid the full contract price by Sandia.
 
 
 15
 The trial court found that CJC performed under its subcontract with Western and provided additional services outside the terms of the contract to correct deficiencies in work performed by Sanchez. The court found that the reasonable value of the work performed by CJC totalled $157,177.80, including $40,000.00 for correcting errors made by Sanchez. In addition, CJC incurred $3,206.47 in costs associated with removing its equipment from the project site. The trial court awarded, on a quantum meruit basis, $160,384.27 to CJC. The court's determination of the reasonable value of the CJC work was based on the invoices submitted to Western by CJC which in turn were based on the hourly equipment rates in the subcontract.
 
 C. Hugg
 
 16
 After Western had terminated Sanchez, on or about July 26, 1982, Western signed a written subcontract with Hugg Surveying Company to survey the existing earthwork on the project and prepare a report showing the percentage of the earthwork subcontract completed by Sanchez and to set construction stakes for the next earthmoving subcontractor, CJC. The work was to be performed on an hourly basis according to a fee schedule attached to the subcontract. The Hugg subcontract provided for payment by Western upon receipt of Hugg's invoices and further provided for collection expenses, including attorneys' fees and interest on any unpaid balance. Western paid Hugg's initial invoice, but failed to pay Hugg for any work performed after that. In September, Hugg left the project. The district court found that Hugg performed pursuant to the subcontract and awarded Hugg $11,208.40 under the subcontract and prejudgment interest at the contract amount. The court also awarded attorneys' fees. After a hearing on the fees claimed by Hugg's attorneys, the trial court awarded $4,885.37, an amount substantially below that claimed by Hugg.
 
 
 17
 The trial court also rejected claims by Western that Hugg had negligently performed some of its staking duties and refused to deduct from the Hugg invoices the repair costs claimed by Western.
 
 III. The Sanchez Appeal
 A. The quantum meruit award
 
 18
 It is well established that an action in quantum meruit is available to a subcontractor to recover from a breaching contractor under the Miller Act.[2] Wunderlich Contracting Co. v. United States, 240 F.2d 201 (10th Cir.), cert. denied, 353 U.S. 950, 77 S.Ct. 861, 1 L.Ed.2d 859 (1957); Southern Painting Co. of Tenn. v. United States, 222 F.2d 431, 433 (10th Cir.1955); see also United States ex rel Coastal Steel Erectors, Inc. v. Algernon Blair, Inc., 479 F.2d 638 (4th Cir.1973). Recovery in quantum meruit is measured by the reasonable value of the subcontractor's performance. Southern Painting, 222 F.2d at 433-34, (citing United States ex rel Susi Contracting v. Zara Contracting Co., 146 F.2d 606, 610 (2d Cir.1944)). The standard for measuring the reasonable value of the subcontractor's performance is frequently defined as "the amount for which such services could have been purchased from one in the plaintiff's position at the time and place the services were rendered." Coastal Steel, 479 F.2d at 641, (citing United States ex rel F.E. Robinson Co. v. Alpha-Continental, 273 F.Supp. 758, 777 (E.D.N.C.1967), aff'd 404 F.2d 343 (4th Cir.1968), cert. denied, 395 U.S. 922, 89 S.Ct. 1774, 23 L.Ed.2d 239 (1969)). The value of the services provided is not limited by the contract price. Thus, "[t]he impact of quantum meruit is to allow a promisee to recover the value of services he gave ... irrespective of whether he would have lost money on the contract and been unable to recover in a suit on the contract." Coastal Steel, 479 F.2d at 641.
 
 
 19
 This standard is clearly applicable to the Sanchez claim. The trial court found that Sanchez underbid the subcontract and would have lost money if the subcontract had been completed. Accordingly, the court granted Sanchez' quantum meruit claim and calculated the reasonable value of the services rendered. Sanchez appeals the award as inadequate, arguing that the district court improperly calculated the value of the services rendered prior to the termination of the subcontract by Western.
 
 
 20
 The trial court found that the reasonable value of the earthwork subcontract was $475,000. It should be noted that Western disputes that finding, arguing that the Sanchez bid (less than $300,000) and later bids by CJC and Metcalf[3] demonstrate a lower value. The trial court's finding is not clearly erroneous and we will not disturb it. The trial court also found that Sanchez completed 40% of the earthwork subcontract, apparently relying on the testimony of Morrison, who was Sandia's surveyor, and Hugg, who was hired by Western to cross-section Sanchez' work and estimate the percentage of earthwork completed. Sanchez disputes that finding. First, Fred Sanchez testified that he had completed approximately 70% of the earthwork. Second, Sanchez argues that the estimates of Hugg and Morrison were merely "guesswork," and that the data compiled by the two surveyors can be interpreted to show a much higher completion percentage. Again, there is evidence in the record to support the district court's finding and it is not clearly erroneous.
 
 
 21
 The court then determined that the reasonable value of the work performed by Sanchez was 40% of $475,000, or $190,000. Sanchez argues that the court's methodology underestimated the value of his work because the percentage of earth moved does not necessarily equate with the costs incurred. In other words, "[w]hile the job may be only forty percent (40%) complete in terms of volume of total earth to be moved into place, it may be already eighty percent (80%) complete in terms of the cost of moving such earth." Brief for Sanchez at 9. Sanchez argues that the actual costs incurred by Sanchez (estimated at $360,902.50) are a better measure of the value of the work done. Although the district court's reasoning is not completely clear, we believe that the court could not properly rely on Sanchez' unit prices to determine the "reasonable value" of the work because the testimony indicated that Sanchez was (1) not always moving earth in the most efficient manner; and (2) not always moving it to the right place. Thus, the amount of earth moved and the time required by Sanchez does not provide a reliable estimate of the value of that performance to Western. We see no reason to alter the value of Sanchez' performance as calculated by the district court.
 
 
 22
 Finally, the district court reduced the award to Sanchez by deducting $40,000 as the cost of correcting errors made by Sanchez. Sanchez argues that this adjustment was incorrect. After reviewing the claims made by Sanchez, we find (1) the trial court's finding that Sanchez' work was defective in some respects is not clearly erroneous; (2) similarly, the trial court's estimate that correcting those errors cost Western $40,000 is not clearly erroneous; and (3) the theory of the award to Sanchez--quantum meruit--requires that the court deduct the cost of corrective work to properly arrive at the value of performance.[4] See W.F. Magann Corp. v. Diamond Mfg. Co., Inc., 775 F.2d 1202, 1208 (4th Cir.1985) ("a threshold requirement for recovering quantum meruit damages is that the defendant receive the benefit of the plaintiff's performance. Otherwise, the defendant cannot be unjustly enriched."); Leo Spear Constr. Co. v. Fidelity and Casualty Co. of New York, 446 F.2d 439, 443-44 (2d Cir.1971) (deductions for corrective work in quantum meruit recovery); Restatement (Second) of Contracts Sec. 373 comment d (1979) ("the party in breach is liable only to the extent that he has benefited from the injured party's performance.").
 
 
 23
 Sanchez also argues that the trial court erred by not increasing the award by the value of extra rock excavation. The trial court did find that the plans prepared by Sandia significantly underestimated the rock excavation to be done on the project and that Sanchez did excavate much more rock than called for by the plans. However, these findings were, in part, the basis for the court's quantum meruit award. Sanchez was unable to recover for the extra rock excavation under the contract because it failed to seek a change order as required by the terms of the contract.[5] Under a quantum meruit theory, Sanchez may recover the reasonable value of the work performed. As noted earlier, in this context, the award is measured by the value of the work to Western, not the costs incurred by Sanchez. This is a difficult question, because the trial court's estimate of the reasonable value of the earthwork subcontract may not have included the extra rock excavation. However, after a careful review of the record, we are unable to find a clear error by the trial court. Although the trial court did not explicitly find that the extra rock excavation was included in its estimate of the value of the earthwork subcontract, such a finding is implicit.
 
 
 24
 Finally, Sanchez relies on a contract theory to suggest an alternative damage award. Western demonstrates that under a properly calculated contract damage award, the award to Sanchez would actually be reduced. We find no merit in Sanchez' contract claim. Similarly, we reject Sanchez' claim that $30,000.00 in profits should be added to the court's quantum meruit award. The evidence supports the trial court's finding that Sanchez would have made no profit on the contract.
 
 B. Prejudgment Interest
 
 25
 Sanchez also urges this court to modify the district court's judgment and award prejudgment interest on the amount due from Western. We decline. We have held that it is proper to award interest in Miller Act cases if allowed by state law. Arnold v. United States, 470 F.2d 243, 246 (10th Cir.1972). However, subsequent to our decision in Arnold, the United States Supreme Court held, in considering an award of attorneys' fees under the Miller Act, that the Act "provides a federal cause of action, and the scope of the remedy as well as the substance of the rights created thereby is a matter of federal not state law." F.D. Rich, Inc. v. United States ex rel Indus. Lumber Co., 417 U.S. 116, 127, 94 S.Ct. 2157, 2164, 40 L.Ed.2d 703 (1974). While the Court's holding is not expressly applicable to the question of prejudgment interest, a fair reading of the Court's language includes awards of interest. In light of this conflict, we adopt the reasoning of the United States Court of Appeals for the Fifth Circuit when faced with the identical question:
 
 
 26
 Since prejudgment interest falls within the "scope of the remedy" available to a Miller Act claimant, it appears that under the authority of F.D. Rich, its allowance must be initially determined as a matter of federal law.
 
 
 27
 Such a determination, however, merely leads us back to state law. Neither the Miller Act nor any other applicable federal law provides standards for the allowance of prejudgment interest. It therefore seems appropriate to look to state law "as a matter of convenience and practicality."
 
 
 28
 United States ex rel Georgia Elec. Supply Co., v. U.S. Fidelity and Guar. Co., 656 F.2d 993, 997 (5th Cir. Unit B 1981) (quoting in part, Louisiana & Arkansas Ry. Co. v. Export Drum Co., 359 F.2d 311, 317 (5th Cir.1966));[6] see also United States ex rel Seminole Sheet Metal Co. v. SCI, Inc., 828 F.2d 671, 677-78 (11th Cir.1987) (looks to Florida law on prejudgment interest); United States ex rel. J.R. Canion v. Randall & Blake, 817 F.2d 1188, 1193 (5th Cir.1987) (looks to Texas law on prejudgment interest); United States ex rel De Blasio Constr., Inc. v. Mountain States Constr., 588 F.2d 259, 263-63 (9th Cir.1978) (looks to Washington law on prejudgment interest).
 
 
 29
 In New Mexico, "where the amount of indebtedness under the contract is ascertainable by the breaching party, the injured party is entitled to interest as a matter of right on those monies at the legal rate." Grynberg v. Roberts, 102 N.M. 560, 698 P.2d 430, 432 (1985) (emphasis in original); see N.M.Stat.Ann. Sec. 56-8-3 (Supp.1987). The New Mexico Supreme Court has held that the New Mexico statute governing prejudgment interest should be construed according to the Restatement of Contracts Sec. 337 (1932),[7] Shaeffer v. Kelton, 95 N.M. 182, 619 P.2d 1226, 1231 (1980); O'Meara v. Commercial Ins. Co., 71 N.M. 145, 376 P.2d 486, 490-91 (1962), and has described the standard for awarding prejudgment interest with a variety of language. For example, prejudgment interest is awarded where the amount of the debt is a "mere matter of calculation," Allsop Lumber Co. v. Continental Casualty Co., 73 N.M. 64, 385 P.2d 625, 634 (1963); where "the exact sum of the indebtedness can be readily ascertained," O'Meara, 376 P.2d at 490; or where "the amount owed is 'ascertainable by a mathematical calculation from a standard fixed in the contract or from established market prices.' " Grynberg, 698 P.2d at 432 (quoting Restatement of Contracts Sec. 337(a) (1932)).
 
 
 30
 Sanchez is unable to claim prejudgment interest under any of these formulations of the New Mexico rule. The trial court's award was based, not on any standard in the subcontract, but on an approximation of the reasonable value of Sanchez' work and an estimate of the amount of the contract completed by Sanchez, after considering the conflicting evidence presented at the trial. Neither of these figures was certain or ascertainable from the contract terms at the time Western breached the subcontract. There is no basis for reversing the trial court's decision not to award Sanchez prejudgment interest.
 
 C. Attorneys' Fees
 
 31
 The question of attorneys' fees in a Miller Act action is a matter of federal law. F.D. Rich, 417 U.S. at 127, 94 S.Ct. at 2164. In F.D. Rich, the Supreme Court reversed an award of attorneys' fees by a federal court applying California law to a Miller Act suit. The Act does not provide attorneys' fees for the prevailing party. Absent a provision in the contract or payment bond awarding attorneys' fees, a Miller Act plaintiff may only recover under one of the federally recognized "exceptions to the general principle that each party should bear the costs of its own legal representation." Id. at 129, 94 S.Ct. at 2165. See also United States ex rel Youngstown Welding and Engineering Co. v. Travelers Indem. Co., 802 F.2d 1164, 1166 (9th Cir.1986) ("No fee award is permitted under the Miller Act unless one of the traditional exceptions to the American Rule is established."). Specifically, "attorneys' fees may be awarded to a successful party when his opponent has acted in bad faith, vexatiously, wantonly, or for oppressive reasons ..." F.D. Rich, 417 U.S. at 129, 94 S.Ct. at 2165. Alternatively, an award of fees may be proper "where a successful litigant has conferred a substantial benefit on a class of persons and the court's shifting of fees operates to spread the costs proportionately among the members of the benefited class." Id. at 129-30, 94 S.Ct. at 2165. Neither of these exceptions is applicable to Sanchez' claim and we find no abuse of discretion in the district court's decision denying attorneys' fees.
 
 IV. The CJC Appeal
 A. Prejudgment Interest
 
 32
 CJC argues that the district court improperly denied CJC's claim for prejudgment interest on the recovery from Western. While we are confident that Sanchez is not entitled to prejudgment interest, the claim of CJC presents a different question. The two judgments, both for the reasonable value of the subcontractors' performance under a theory of quantum meruit, were calculated in different ways. In determining the value of Sanchez' work, the trial court ignored the subcontract and calculated the value from other evidence. In contrast, the quantum meruit award to CJC was calculated by reference to the invoices submitted by CJC which were based on the hourly rates included in the contract. In other words, the award was "ascertainable by mathematical calculation from a standard fixed in the contract." Grynberg v. Roberts, 102 N.M. 560, 698 P.2d 430, 433 (1985) (quoting Restatement of Contracts Sec. 337(a) (1932)). See also, Restatement (Second) of Contracts Sec. 354 comment c (1979) ("The sum due is sufficiently definite [to award prejudgment interest] if it is ascertainable from the terms of the contract, as where the contract fixes a price per unit of performance, even though the number of units performed must be proved and is subject to dispute."). Moreover, Western did not dispute the value of CJC's performance, as measured by the unit prices in the contract, but instead, argued that CJC had breached the contract, leaving CJC liable to Western for damages incurred in completing the earthwork. See Defendant's Answer, Affirmative Defenses and Counterclaim, R.Vol. I., at 107-12. Thus, the focus of the trial and the dispute was not the value of CJC's performance, but which party had breached the contract. In addition, as indicated above, the amount due under the subcontract was readily ascertainable by Western at the time it breached the contract. Again, the New Mexico Supreme Court has noted that "receipt of an invoice showing the amount owed is sufficient notice to a reasonable person of the amount in which he is indebted under his contract." Grynberg, 698 P.2d at 433.
 
 
 33
 Western argues, however, that because the trial court based the award to CJC on a quantum meruit theory, prejudgment interest is unwarranted. In other words, because a quantum meruit recovery must, of necessity, be calculated after trial, such an award is, by its very nature, unascertainable and not susceptible to prejudgment interest.[8] Normally, this statement is correct. See, e.g., McCarty Corp. v. Pullman-Kellogg, Div. of Pullman, Inc., 751 F.2d 750, 762 (5th Cir.1985) (applying Louisiana law). However, this is not an unyielding rule. See Kisco Co. v. Verson Allsteel Press Co., 738 F.2d 290, 296 (8th Cir.1984) ("Prejudgment interest may be awarded in an action in quantum meruit.") (applying Missouri law); United States ex rel Confederate Constr. Co. v. United States Fidelity and Guar. Co., 644 F.2d 747, 749 (8th Cir.1981) (affirms award of prejudgment interest on subcontractor's Miller Act claim for earthwork done outside written contract); Paul Hardeman, Inc., v. Arkansas Power & Light Co., 380 F.Supp. 298, 342 (E.D.Ark.1974) (applying Arkansas law); 11 Williston on Contracts, Sec. 1415 (3d ed. 1968) ("Interest is allowed not simply when an express contract is broken but also where money is wrongly withheld by the defendant and the plaintiff's right is based on quasi-contract."). In fact, this court, applying New Mexico law to a Miller Act dispute in Fanderlik-Locke Co. v. United States ex rel M.B. Morgan, 285 F.2d 939, 948 (10th Cir.1960), cert. denied, 365 U.S. 860, 81 S.Ct. 826, 5 L.Ed.2d 823 (1961) affirmed an award of prejudgment interest on a portion of a quantum meruit award which was "susceptible to accurate calculation."
 
 
 34
 Thus, in certain circumstances, where the trial court must rely on the theory of quantum meruit to permit recovery for work performed outside the written contract but also relies on the express terms of that contract to determine the value of that work, the injured party is entitled to prejudgment interest. We believe that CJC's claim falls within this narrow exception. We see no reason to penalize CJC further for Western's breach of the contract, or to allow Western to benefit from the breach by having the free use of the money owed to CJC during this period.
 
 
 35
 Finally, awarding prejudgment interest to CJC in this case is consistent with the purpose of interest as an element of damages.
 
 
 36
 Awarding prejudgment interest is intended to serve at least two purposes: to compensate prevailing parties for the true costs of money damages incurred, and, where liability and the amount of damages are fairly certain, to promote settlement and deter attempts to benefit unfairly from the inherent delays of litigation.
 
 
 37
 Stroh Container Co. v. Delphi Industries, Inc., 783 F.2d 743, 752 (8th Cir.), cert. denied, 476 U.S. 1141, 106 S.Ct. 2249, 90 L.Ed.2d 695 (1986); see also Turner v. Japan Lines, Ltd., 702 F.2d 752, 756 (9th Cir.1983) (purpose of prejudgment interest is "to compensate the wronged person for being deprived of the monetary value of the loss from the time of the loss to the payment of the money judgment"); United Nuclear Corp. v. Allendale Mut. Ins. Co., 103 N.M. 480, 709 P.2d 649, 657 (1985) ("Prejudgment interest is meant to compensate a plaintiff for injury resulting from deprivation of the promised performance and for loss of the use and earning power of plaintiff's own funds that have been expended as a result of a defendant's failure to pay.") (citation omitted). In this case, Western has deprived CJC of the use of a certain sum and CJC was forced to borrow money to meet financial obligations incurred as a result of Western's breach of the subcontract. An award of interest will partially compensate CJC and, because Western had notice of the amount due, there is no unfairness to Western. See Grynberg, 698 P.2d at 432-33.
 
 
 38
 We therefore reverse the district court's judgment and award CJC interest at the rate of 15% annually on $78,636.66 from September 15, 1982 to the date of judgment and interest at the rate of 15% annually from October 15, 1982 on $78,541.14.[9] We have chosen to apply the interest rate from the current New Mexico statute governing prejudgment interest, N.M.Stat.Ann. Sec. 56-8-3 (Supp.1987), even though we recognize that the statutory rate at the time the debt was incurred was 10% and CJC's appeal requested that rate. As noted earlier, prejudgment interest awards on Miller Act claims are governed by federal law. Thus, we are free to choose an interest rate which "will fairly compensate the plaintiff for the delay in the receipt of payment." United States v. West Virginia, 764 F.2d 1028, 1031 (4th Cir.1985), aff'd, --- U.S. ----, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987); see Royal Indem. Co. v. United States, 313 U.S. 289, 296, 61 S.Ct. 995, 997-98, 85 L.Ed. 1361 (1941); United States v. Dollar Rent-A-Car Systems, 712 F.2d 938, 941 (4th Cir.1983). The current New Mexico statutory rate accomplishes that purpose. Finally, we are not awarding prejudgment interest on the $3,206.47 awarded CJC by the district court as reimbursement for costs incurred in moving equipment from the construction site. The record does not indicate that Western received notice or an invoice for this claim before the complaint was filed and it is clear that Western had no notice of this claim when it breached the contract on September 15, 1982 as CJC did not leave the site until after that date.
 
 B. Attorneys' Fees
 
 39
 CJC also appeals the trial court's decision denying its claim for attorneys' fees. As noted earlier in regard to Sanchez' claim for attorneys' fees, absent a contrary provision in the subcontract, a subcontractor may not recover attorneys' fees in a Miller Act claim without first establishing one of the federally recognized exceptions to the traditional American Rule that each party is responsible for its own fees. F.D. Rich, 417 U.S. at 127-30, 94 S.Ct. at 2164-65. In other words, CJC must show that Western acted in bad faith.
 
 
 40
 CJC argues that Western's representations inducing CJC to sign the contract and refusal to pay for the work performed demonstrate the required bad faith. However, we are bound by the trial court's findings of fact unless clearly erroneous and the trial court did not find bad faith on the part of Western. We decline to read the trial court's findings regarding the representations made to CJC and Western's supervisory problems as broadly as CJC suggests. While those findings may raise questions regarding Western's competence and integrity as a contractor and indicate confusion, mismanagement and even misrepresentation, Western's actions did not rise to the level that would support an award of attorneys' fees to CJC.[10]
 
 
 41
 Alternatively, CJC argues that attorneys' fees must be awarded to fully compensate CJC under a quantum meruit theory. CJC mischaracterizes this theory of recovery. The subcontractor recovering in quantum meruit is entitled to the reasonable value of his performance. Southern Painting, 222 F.2d at 434. The legal costs of recovering the value of that performance do not increase the value of performance and are not recoverable as part of the quantum meruit award. To the extent that CJC remains less than fully compensated, this "merely restates one of the oft-repeated criticisms of the American Rule." F.D. Rich, 417 U.S. at 128, 94 S.Ct. at 2164.
 
 
 42
 Finally, the subcontract between CJC and Western provided that the subcontractor, CJC, would be liable for attorneys' fees in the event CJC breached the contract. No similar provision protected the subcontractor, yet CJC urges, based on "principles of reciprocity and mutuality of obligation in contract," Brief for CJC at 17, that we construe the clause as mutual. We reject this suggestion for two reasons. First, CJC is recovering outside the contract, on a theory of quantum meruit. The provision is not relevant. Second, CJC cites no authority which indicates that such a construction of the contract provision is appropriate in these circumstances and we decline to make such a dramatic change in the agreement of the parties.
 
 C. Consequential Damages
 
 43
 CJC asks us to modify the district court's judgment and award consequential damages. Specifically, CJC notes that as a result of Western's failure to pay CJC when due under the contract, CJC has been forced to pay interest on equipment rental charges and borrowed funds. Once again, we begin by considering the basis for the district court's award. CJC has recovered the reasonable value of its performance under a theory of quantum meruit. As we noted in our discussion of prejudgment interest, such an award does not necessarily bar recovery of all other damages, but that is normally the case. CJC points to no federal or New Mexico law nor compelling circumstances that would lead us to alter the district court's judgment and award consequential damages in addition to the quantum meruit recovery.
 
 
 44
 CJC also relies on the provision in the subcontract designed to hold CJC harmless from the actions of the previous earthworking subcontractor, linking the interest payments to the work required to repair the Sanchez errors. Even if we were inclined to enforce this contractual provision in addition to the quantum meruit award, it affords CJC no relief. The consequential damages incurred flowed from Western's breach of the subcontract, the failure to pay, rather than from any actions of the prior subcontractor. CJC cannot stretch the hold harmless provision that far.
 
 D. Punitive Damages
 
 45
 Finally, CJC argues that the trial court erred in failing to award punitive damages. Punitive damages are not normally recoverable for a breach of contract. See Restatement (Second) of Contracts Sec. 355 (1979) ("Punitive damages are not recoverable for a breach of contract unless the conduct constituting the breach is also a tort for which punitive damages are recoverable."). However, New Mexico law allows recovery of punitive damages for a breach of contract in extraordinary circumstances.[11] New Mexico courts may award punitive damages in a contract action where the conduct of the party breaching the contract may be characterized as "maliciously intentional, fraudulent, oppressive, or committed recklessly or with a wanton disregard of the plaintiffs' rights." Loucks v. Albuquerque Nat'l Bank, 76 N.M. 735, 418 P.2d 191, 199 (1966). See State Farm General Ins. Co. v. Clifton, 86 N.M. 757, 527 P.2d 798, 800 (1974); Robison v. Katz, 94 N.M. 314, 610 P.2d 201, 208 (Ct.App.), cert. denied, 94 N.M. 675, 615 P.2d 992 (1980). Once again, the trial court did not find that Western acted in bad faith, or that Western's action were so extreme as to justify an award of punitive damages. We have reviewed the record and find no error in the trial court's judgment. Moreover, we have reviewed the New Mexico decisions cited by CJC and are not convinced that Western's conduct is comparable to those defendants who were assessed punitive damages.[12] We affirm the district court's decision to deny punitive damages to CJC.
 
 
 46
 The district court's decision is reversed in part and remanded for the calculation of interest on the award.
 
 V. The Hugg Appeal
 
 47
 The contract between Western and Hugg was executed on a Hugg work order form. That work order provided that "Should the account be referred to an attorney for collection, the undersigned shall pay all attorney's fees and collection expenses." R.Vol. II at 18. The trial court found that Hugg was entitled to attorneys' fees pursuant to this provision of the contract.
 
 
 48
 In a post-trial hearing, Hugg's attorneys submitted a request, with supporting records, for $13,538.72. The trial court reduced the award in three separate adjustments. First, the trial court deleted certain hours from the pretrial billings. R.Vol. XXIII at 3328-30. Next the court discounted the entire pretrial bill by 25% based on a perceived "tendency to puff" the time charged. Id. at 3330. Finally, the court ignored the time billed by Hugg's two attorneys for the trial and reasoned that, if the Hugg claim had been tried alone, rather than consolidated with the CJC and Sanchez claims it would have taken only a few days and allowed recovery for the time of one lawyer for four days, or $1200. Id. at 3331. These decisions by the district court reduced the claim for attorneys' fees to $4,885.37, which Hugg appeals as inadequate.
 
 
 49
 In this case, the parties relied on New Mexico law. Hugg structured its claim for attorneys' fees to conform to standards expressed by the New Mexico courts and Western objected to that claim based on those same standards.[13] The district court properly determined that these New Mexico decisions were not controlling and chose instead to rely on federal standards for awarding attorneys' fees under the federal Civil Rights Act[14] and proceeded to calculate a "reasonable fee" for the work performed by Hugg's attorneys. These decisions, and many others awarding fees under a long list of federal statutes, suggest factors to be considered and weighed by district courts in fashioning fee awards.[15] Many of those factors are also relevant to an award of fees pursuant to a contract. However, because the purpose of an award of attorneys' fees under the federal civil rights acts or other statutes is fundamentally different from the purpose of a contract for fees between parties in a commercial agreement, the district court applied the wrong standard and scrutinized the claim for fees too closely. Accordingly, we remand the question to the district court for a review consistent with the purpose of the contract provision: to make the non-breaching party whole.
 
 
 50
 Close scrutiny of awards under federal fee-shifting statutes is justified because these
 
 
 51
 statutes were not designed as a form of economic relief to improve the financial lot of attorneys, nor were they intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client. Instead, the aim of such statutes was to enable private parties to obtain legal help in seeking redress for injuries resulting from the actual or threatened violation of specific federal laws.
 
 
 52
 Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, --- U.S. ----, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986). See also Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, --- U.S. ----, 107 S.Ct. 3078, 3091, 97 L.Ed.2d 585 (1987) (Blackmun, J., dissenting) ("basic purpose of statutory attorneys fees [is to ensure] that 'private citizens ... have a meaningful opportunity to vindicate the important Congressional policies which these laws contain' ") (quoting in part S.Rep. No. 94-1011, 94th Cong.2d Sess. 2, (1976), U.S.Code Cong. & Admin.News 1976, p. 5908). To achieve this purpose,
 
 
 53
 the district court must carefully scrutinize the total number of hours reported to arrive at the number of hours that can reasonably be charged to the losing party, much as a senior partner in a private firm would review the reports of subordinate attorneys when billing clients whose fee arrangement requires a detailed report of hours expended and work done.
 
 
 54
 Ramos v. Lamm, 713 F.2d 546, 555 (10th Cir.1983).
 
 
 55
 In contrast, where contracting parties have agreed that a breaching party will be liable for attorneys' fees, the purpose of the award is to give the parties the benefit of that bargain, and the court's responsibility is to enforce that bargain.[16] Normally, where the court is merely enforcing a contractual provision authorizing attorneys' fees, the fees are routinely awarded and the contract is enforced according to its terms. See Fortier v. Dona Ana Plaza Partners, 747 F.2d 1324, 1337-38 (10th Cir.1984) (applying New Mexico law); Engel v. Teleprompter Corp., 732 F.2d 1238, 1241 (5th Cir.1984); Austin v. Parker, 672 F.2d 508, 518-20 (5th Cir. Unit A 1982); 6 Moore's Federal Practice p 54.78 (1987).
 
 
 56
 When the agreement between the contractor and the subcontractor provides for attorneys' fees, the subcontractor may recover from the contractor and its Miller Act surety consistent with the terms of that agreement. See United States ex rel. Micro-King Co. v. Community Science Technology, Inc., 574 F.2d 1292, 1295 (5th Cir.1978); United States ex rel Carter Equip. Co., v. H.R. Morgan, Inc., 554 F.2d 164, 166 (5th Cir.1977); Travelers Indem. Co. v. United States ex rel Western Steel Co., 362 F.2d 896, 899 (9th Cir.1966); Ibex Indus., Inc. v. Coast Line Waterproofing, 563 F.Supp. 1142, 1146 (D.D.C.1983). This does not mean, however, that the trial court should simply award the full amount billed by the prevailing party's attorneys. We reject Hugg's argument that the contract necessarily requires the recovery of all attorneys' fees. Clearly, the trial court has discretion to adjust or even deny a contractual award of fees if such an award would be inequitable or unreasonable. See United States ex rel DeBlasio Constr., Inc. v. Mountain States Constr. Co., 588 F.2d 259, 263 (9th Cir.1978) (affirmed trial court's decision to deny fees where recovering party was partly at fault); Gorman Pub. Co. v. Stillman, 516 F.Supp. 98, 113 (N.D.Ill.1980) (court's power to deny contractual award of attorneys' fees as inequitable or unreasonable is based on "implied covenant of good faith and fair dealing"); United States v. Hankins Constr. Co., 510 F.Supp. 933, 940 (E.D.Mo.1981) (denied contract award of attorneys' fees to Miller Act defendant where it would have been "inequitable").
 
 
 57
 While Miller Act plaintiffs may recover attorneys' fees, the cases awarding such fees under contractual provisions do not offer a clear statement of the law that applies to these claims or the standard by which they are reviewed. However, the Fifth Circuit has characterized the district court's role in reviewing contractual awards of attorneys' fees when enforcing maritime liens as follows:
 
 
 58
 "Where attorney's fees are provided by contract, a trial court does not possess the same degree of equitable discretion to deny such fees as it has when applying a statute providing for a discretionary award." Of course, it may nevertheless, reduce the contractual attorney's fees claimed if it finds such an award "would be inequitable and unreasonable."
 
 
 59
 General Elec. Credit Corp. v. Oil Screw Triton, VI, 712 F.2d 991, 995 (5th Cir.1983) (quoting in part Cable Marine, Inc. v. M/V Trust Me II, 632 F.2d 1344, 1345 (5th Cir. Unit B 1980)).[17] We adopt this as the appropriate standard to apply to Hugg's claim for attorneys' fees. In other words, the trial court's role is to determine if the claimed fees are inequitable or unreasonable. If so, the trial court has discretion to deny or reduce the fee award. However, the trial court is not responsible for independently calculating a "reasonable" fee.
 
 
 60
 This distinction is subtle but important, as demonstrated by a review of Hugg's claim. First, the consolidated trial of the three actions against Western required seventeen days of hearings. Hugg's claim was by far the simplest of the three actions, yet Hugg was forced to participate throughout the trial, because its claims were interwoven with the other actions. Moreover, when Western initially moved to consolidate the hearings, Hugg objected, arguing that its case would be drawn out and more expensive if consolidated with the claims of Sanchez and CJC. But in reviewing the billings for Hugg's attorneys at trial, the district court ignored the consolidation and reduced the award to approximate the costs of a single trial on Hugg's claim. The district court's action was probably proper if the task was to independently calculate a "reasonable" fee,[18] but at the same time, it is apparent to us that billing for the time actually consumed in litigating Hugg's claim in the consolidated trial was not unreasonable. This is particularly true in this case because the consolidation was at the request of, and for the benefit of, the breaching party. The trial court's adjustment penalizes Hugg (and deprives Hugg of the contract bargain) to Western's benefit. Similarly, the trial court found that the claim could have reasonably been tried by one attorney, but it is not necessarily unreasonable that a party would employ two trial attorneys to litigate a commercial claim of this nature. Applying the same reasoning, if the trial court finds that the pretrial billings overstated the time actually spent preparing for trial, the claim is unreasonable and must be reduced.
 
 
 61
 While we are directing the district court to apply a different standard to contractual awards of attorneys' fees, we should also make it clear what we are not holding. In considering whether a fee is unreasonable or excessive, the trial court need not wholly disregard the familar factors from the federal cases awarding fees in a statutory context. See, e.g., Ramos v. Lamm, 713 F.2d 546 (10th Cir.1983). The district court may choose to use these factors, not to compute a reasonable fee, but to assist in determining if the fees claimed are unreasonable or inequitable. In addition, it remains important for the district court to provide a "concise but clear explanation" of its reasons for any adjustments to the fee award. Mares v. Credit Bureau of Raton, 801 F.2d 1197, 1201 (10th Cir.1986) (quoting Hensley v. Eckerhart, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983)).
 
 
 62
 Hugg also asks for the attorneys' fees incurred in executing this appeal. We direct the district court to award fees for the costs of defending against Western's appeal, but Hugg is not entitled to recover attorneys' fees for the costs of appealing the district court's fee award. Those fees are not recoverable under the terms of the Hugg subcontract. The Hugg claim for attorneys' fees is remanded to the district court for proceedings consistent with this opinion.
 
 VI. The Western Appeal
 
 63
 A. Quantum meruit award to CJC.
 
 
 64
 Western launches a broad attack on the trial court's decision to award CJC quantum meruit damages and the factual findings underlying that award. Western argues (1) that the trial court misinterpreted the CJC subcontract; (2) that Western did not breach the contract; and (3) that CJC's abandonment of the project site was unjustified and in breach of the subcontract.
 
 
 65
 Our Miller Act decisions suggest that a subcontractor may recover in quantum meruit from the prime contractor and surety in at least two instances. First, where there is a substantial breach of the subcontract, the subcontractor "may forego any suit on the contract and sue for the reasonable value of his performance." St. Paul-Mercury Indem. Co. v. United States ex rel H.C. Jones, 238 F.2d 917, 922 (10th Cir.1957) (also held that nonpayment was a substantial breach. Id. at 923.); Southern Painting Co. v. United States ex rel E.M. Silver, 222 F.2d 431, 433-34 (10th Cir.1955) (quoting United States ex rel Susi Contracting Co. v. Zara Contracting Co., 146 F.2d 606, 610 (2d Cir.1944)); see also W.F. Magann Corp. v. Diamond Mfg. Co., 775 F.2d 1202, 1205-07 (4th Cir.1985); United States ex rel Sunworks Div. of Sun Collector Corp. v. Ins. Co. of N. Am., 695 F.2d 455, 458 (10th Cir.1982) (New Mexico recognizes quantum meruit claim for breach of subcontract); Coastal Steel, 479 F.2d at 640; United States ex rel. Pickard v. Southern Constr. Co., 293 F.2d 493, 498 (6th Cir.1961). Alternatively, the subcontractor may recover in quantum meruit where it has performed work outside the terms of the contract that benefits the prime contractor. Hensel Phelps Constr. Co. v. United States ex rel Reynolds Elec. and Engineering Co., 413 F.2d 701, 704 (10th Cir.1969); Fanderlik-Locke, 285 F.2d at 946; Wunderlich, 240 F.2d at 204-05; see also Gruschus v. C.R. Davis Contracting Co., 75 N.M. 649, 409 P.2d 500, 502 (1965) (New Mexico recognizes quantum meruit recovery for extra work).[19]
 
 
 66
 The district court found both of these conditions met for CJC's claim against Western. First, Western breached the contract by failing to pay the invoices due CJC by September 15, 1982 and by improperly supervising the construction project. Second, the contract understated the amount of corrective work necessary and CJC performed substantial additional work beyond the terms of the written subcontract. Western challenges these findings, but we find no error by the district court. First, the evidence supports the finding that Western breached the CJC subcontract. On September 15, 1982 substantial sums were due to CJC under the terms of the subcontract, but Western made no payment.[20] Failure to make such a payment when due is a substantial breach of the contract entitling the subcontractor to recover in quantum meruit for the reasonable value of the work performed. St. Paul Mercury, 238 F.2d at 922.[21] Western argues, however, that nonpayment was justified by CJC's poor performance, pointing to a provision in the subcontract which states that "no payments are to be made unless the Subcontractor's rate of progress, work done and material and/or services furnished are satisfactory to the Contractor and supervising engineer." R.Vol. I at 27. However, there is no evidence in the record to indicate that Western or Sandia ever expressed displeasure with the quality of CJC's performance and there is evidence to support the trial court's finding that the delays were caused by Western. Furthermore, Western raised this provision as an excuse for nonpayment only after CJC left the project site.
 
 
 67
 Western also argues that the court's finding that CJC performed extra work was based on an erroneous interpretation of the written subcontract. The trial court found that "[e]xcept for ... correction of ... two berm areas, the subcontract did not call for other corrective work, for building of berms, or for corrections of deficiencies in any work performed by the prior earthwork subcontractor, Sanchez." Memorandum Opinion at 9. In contrast, Western believes that, under the terms of the contract, "CJC agreed to bring the project from the condition in which it found ... it, to a state of completion for an agreed maximum price [$150,000.00] within sixty days." Brief for Western at 24. Generally, "the question concerning the interpretation of a written agreement is one of fact."[22] Gomez v. American Elec. Power Serv. Corp., 726 F.2d 649, 651 (10th Cir.1984) (emphasis in original). Thus, we affirm the trial court's interpretation of the contract unless clearly erroneous, and there is evidence, both in the language of the contract and the conduct of the parties, to support the trial court's finding.
 
 
 68
 Once it was determined that the CJC subcontract was limited in scope, it is apparent that some of the work done by CJC was outside the terms of that contract, and CJC may recover for that work. "Where, at the request of the prime contractor, labor and material is furnished by a subcontractor which is in addition to that required in the subcontract, there is an implied promise to pay the reasonable value therefor." Fanderlik-Locke, 285 F.2d at 946. See also Wunderlich, 240 F.2d at 205 ("Burdens other than those contemplated by the contract, may not be placed upon the contractor without additional compensation."). In short, the district court's decision to base CJC's recovery on a quantum meruit theory is correct.[23]
 
 
 69
 Western further argues that the district court improperly calculated the quantum meruit award, but Western relies on a breach of contract theory, not a quantum meruit recovery, to suggest an alternative method of computing the award. See Autrey v. Williams and Dunlap, 343 F.2d 730, 740 (5th Cir.1965) (cited in Brief for Western at 37). As we have noted, the trial court relied on the invoices submitted by CJC and the hourly equipment rates in the subcontract to determine the value of the services rendered. There is ample support for the principle that the contract price may provide probative evidence of the reasonable value of services rendered, but that the contract price does not impose a limit on quantum meruit recovery. See Constantino v. American S/T Achilles, 580 F.2d 121, 122-23 (4th Cir.1978); United States ex rel Bldg. Rentals Corp. v. Western Casualty and Surety Co., 498 F.2d 335, 338 (9th Cir.1974); Coastal Steel, 479 F.2d at 641; Wynne v. United States ex rel Mid-States Waterproofing Co., Inc., 382 F.2d 699, 701 (10th Cir.1967); see also United States ex rel Robinson v. Alpha-Continental, 273 F.Supp. 758, 777-78 (E.D.N.C.1967) (quantum meruit recovery based on subcontractor's invoices), aff'd, 404 F.2d 343 (4th Cir.1968), cert. denied, 395 U.S. 922, 89 S.Ct. 1774, 23 L.Ed.2d 239 (1969); 12 Williston on Contracts Secs. 1480, 1482 (3d ed. 1970) (contract price is important evidence of the value of the performance to the defendant). We also reject Western's assertion that the trial court should have relied on the bid by Sanchez and the price paid to Metcalf to complete the project as evidence of the reasonable value of CJC's work. Sanchez grossly underbid the project, and that bid means nothing to CJC's claim. Moreover, the price paid to Metcalf does not reflect the corrective work done by CJC. Simply put, the bids are not comparable and do not offer probative evidence of the amount for which CJC's services could have been obtained. See Wunderlich, 240 F.2d at 205. Thus, "[t]he amount awarded is within the range of the evidence and is not clearly erroneous." Hensel Phelps, 413 F.2d at 704.
 
 B. Western's counterclaim against CJC
 
 70
 Western argues that CJC breached the contract by walking off the job without sufficient cause, and claims damages for the expenses incurred in completing the project. Because we agree with the trial court's conclusion that Western breached the contract, justifying CJC's action, we affirm the court's decision to dismiss Western's counterclaim.
 
 C. Contract award to Hugg
 
 71
 The trial court found that Western and Hugg entered into a written subcontract to survey the dirt work performed by Sanchez and "to set construction stakes for the next earthmoving subcontractor, CJC, as required," Memorandum Opinion at 14, and awarded Hugg contract damages based on that provision. Western disputes the trial court's finding, but this is a straightforward factual dispute and there is evidence to support the court's decision; we will not disturb it.[24]
 
 
 72
 Western also argues that the trial court erred in dismissing Western's claim against Hugg for negligent work done in setting stakes for the concrete subcontractor. Once again, this is a factual question, and the record includes evidence on both sides. The trial court's resolution of this conflicting testimony is not clearly erroneous.
 
 VII. Conclusion
 
 73
 The district court's decision in United States ex rel Fred Sanchez Construction Co. v. Western States Mechanical Contractors Inc., is AFFIRMED. The district court's decision in United States ex rel CJC, Inc. v. Western States Mechanical Contractors Inc. is REVERSED IN PART AND REMANDED. The district court's decision in United States ex rel Hugg Surveying Co. v. Western States Mechanical Contractors Inc. is REVERSED IN PART AND REMANDED. Western's appeal is DENIED.
 
 
 
 [1]
 The purpose of the Act is to provide an alternative remedy to the mechanics' liens ordinarily available on private construction projects. Because a lien cannot attach to federal property, those supplying labor or materials on a federal construction project are to be protected by the payment bond. J.W. Bateson Co., Inc. v. United States ex rel Bd. of Trustees of the Nat'l Automatic Sprinkler Indus. Pension Fund, 434 U.S. 586, 589, 98 S.Ct. 873, 875, 55 L.Ed.2d 50 (1978); F.D. Rich Co., Inc. v. United States ex rel Indus. Lumber Co., Inc., 417 U.S. 116, 121-22, 94 S.Ct. 2157, 2161, 40 L.Ed.2d 703 (1974); T.F. Scholes, Inc., v. United States ex rel H.W. Moore Equip. Co., 295 F.2d 366, 369 (10th Cir.1961); United States ex rel Mariana v. Piracci Constr. Co., 405 F.Supp. 904, 906-07 (D.D.C.1975)
 
 
 [2]
 On matters of general contract law in Miller Act cases, there is a conflict among the circuits as to whether federal or state law governs the construction of a subcontract to which the United States is not a party. See United States ex rel Federal Corp. v. Commercial Mechanical Contractors, Inc., 707 F.2d 1124, 1126 n. 1 (10th Cir.1982). As in Federal Corp., United States ex rel Eddies Sales and Leasing v. Fed. Ins. Co., 634 F.2d 1050, 1052 (10th Cir.1980), and Burgess Constr. Co. v. M. Morrin & Son Co., 526 F.2d 108, 114 n. 2 (10th Cir.1975), cert. denied, 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976), we find it unnecessary to decide this issue for purposes of this case. We find no conflict between the substantive contract law of New Mexico and the general principles of contract law. For example, New Mexico law also recognizes that a subcontractor may recover under a theory of quantum meruit. See United States ex rel Sunworks Div. of Sun Collector Corp. v. Ins. Co. of N. Am., 695 F.2d 455, 458 (10th Cir.1982) (citing Allsup v. Space, 69 N.M. 353, 367 P.2d 531 (1961)). See also United States ex rel DeBlasio Constr. Co. v. Mountain States Constr. Co., 588 F.2d 259, 262 n. 1 (9th Cir.1978)
 
 
 [3]
 Western argues that CJC "bid" $150,000 to complete the earthwork when it was estimated to be 50% complete and that Metcalf "bid" $100,000 (and was eventually paid $135,000) to complete the work, also estimating that it was 50% complete. These were the contract prices negotiated by the parties, but we are hesitant to characterize that process as bidding, and we do not find Western's argument persuasive. Moreover, Metcalf testified that the earthwork for this contract was "not a $300,000 job" but would have cost much more. R.Vol. XVIII at 2502. The district court relied primarily on Western's own bid to Sandia to estimate the value of the earthwork subcontract
 
 
 [4]
 Sanchez also argues that the court's estimate of completion (40%) includes an adjustment for corrective work and thus, Sanchez is being doubly penalized for the errors. It is evident from the court's findings and calculations that its estimate of completion did not include an adjustment for errors. Testimony on this question is conflicting. Hugg's estimate included an adjustment for errors. R.Vol. X, at 968, 985-86. Morrison's did not. R.Vol. XV, at 1952. Although Sanchez is penalized by this finding, we cannot say that the trial court's resolution of this conflicting evidence is clearly erroneous. Sanchez also argues that Hugg's report omitted the earth work completed in the parking area, but this is not evident from the portions of the record cited by Sanchez, hence we find no error
 
 
 [5]
 Sanchez argues on appeal that it would have sought a change order if not terminated by Western. We are not convinced by this speculation. At the time of the termination, Sanchez had taken no steps toward such a change order
 
 
 [6]
 To the extent that the Fifth Circuit implies that there is no federal law on prejudgment interest, we disagree with that conclusion. Federal courts have occasionally been required to fashion federal rules on prejudgment interest, most often when the United States is a party to a contract. See, e.g., West Virginia v. United States, --- U.S. ----, 107 S.Ct. 702, 705, 93 L.Ed.2d 639 (1987) (citing Royal Indem. Co. v. United States, 313 U.S. 289, 61 S.Ct. 995, 85 L.Ed. 1361 (1941)) ("In the absence of an applicable federal statute, it is for the federal courts to determine, according to their own criteria, the appropriate measure of damage, expressed in terms of interest, for nonpayment of the amount found to be due."); Pa. Dept. of Public Welfare v. United States, 781 F.2d 334, 341 (3d Cir.1986) ("Supreme Court has fashioned federal common law that permits [assessment of prejudgment interest] in certain circumstances"); see also West v. Harris, 573 F.2d 873, 880-84 (5th Cir.1978) (prejudgment interest under National Flood Insurance Act of 1968), cert. denied, 440 U.S. 946, 99 S.Ct. 1424, 59 L.Ed.2d 635 (1979); Southern Painting Co. v. United States ex rel E.M. Silver, 222 F.2d 431, 435 (10th Cir.1955) (reference to "federal rule" of prejudgment interest). However, the fragmentary federal law is not helpful in resolving these claims. Thus, while we recognize that this is a matter of federal law, we have chosen to look to New Mexico law for more definitive standards. More importantly, there is nothing in the federal law of prejudgment interest contrary to our conclusions here
 
 
 [7]
 If the parties have not by contract determined otherwise, simple interest at the statutory legal rate is recoverable as damages for breach of contract as follows:
 (a) where the defendant commits a breach of a contract to pay a definite sum of money, or to render a performance the value of which in money is stated in the contract or is ascertainable by mathematical calculation from a standard fixed in the contract or from established market prices of the subject matter, interest is allowed on the amount of the debt or money value from the time performance was due, after making all the deductions to which the defendant may be entitled.
 (b) where the contract that is broken is of a kind not specified in Clause (a), interest may be allowed in the discretion of the court, if justice requires it, on the amount that would have been just compensation if it had been paid when performance was due.
 Restatement of Contracts Sec. 337 (1932); cf. Restatement (Second) of Contracts Sec. 354 (1979).
 
 
 [8]
 According to Western, "the worth of the work performed by CJC, as found by the trial court, was an amount which required the valuation at trial of the reasonable value of services which were performed over and above the contract, and thus could not be computed by a mere mathematical computation referring to the contract." Answer Brief for Western at 10. However, it is evident from the record and the trial court's finding that the award to CJC was based on a mere mathematical computation. The court awarded CJC the exact amount of the invoices submitted to Western and the invoices were based on the hourly rates included in the written subcontract. No other evidence related to the value of CJC's work was considered
 
 
 [9]
 The interest award is based on the payment date of CJC's invoices. The invoices submitted in July and August, totalling $78,636.76, were due on September 15, 1982. The invoices billed in September ($78,541.14 by our calculation) were not due until October 15, 1982. Arguably, Western could be held liable for the entire amount from the time of the breach, but we have chosen to assess the interest from the payment dates in the contract
 
 
 [10]
 While Western's conduct justifies neither attorneys' fees nor punitive damages, we are compelled to repeat the observation of the North Carolina District Court: "If all Government projects are carried on in the same manner as this project, it is a wonder we do not have even more litigation in this field. The way in which this contract was handled was a breeding ground for litigation from the very beginning." United States ex rel F.E. Robinson v. Alpha-Continental, 273 F.Supp. 758, 776 (E.D.N.C.1967), aff'd, 404 F.2d 343 (4th Cir.1968), cert. denied, 395 U.S. 922, 89 S.Ct. 1774, 23 L.Ed.2d 239 (1969)
 
 
 [11]
 We do not decide whether federal or state law would govern the award of punitive damages in a Miller Act action. We find no basis for awarding punitive damages under either
 
 
 [12]
 CJC relies on several New Mexico cases that define "bad faith" as "any frivolous or unfounded refusal to pay; it is not necessary that such refusal be fraudulent." State Farm General Ins. Co. v. Clifton, 86 N.M. 757, 527 P.2d 798, 800 (1974) (quoting 3 J. Appleman, Insurance Law and Practice Sec. 1612 (1969)); Aragon v. General Elec. Credit Corp., 89 N.M. 723, 557 P.2d 572, 575 (Ct.App.), cert. denied, 90 N.M. 7, 558 P.2d 619 (1976); Curtiss v. Aetna Life Ins. Co., 90 N.M. 105, 560 P.2d 169, 173 (Ct.App.), cert. denied, 90 N.M. 7, 558 P.2d 619 (1976). These cases are distinguishable both by the severity of the defendant's conduct and the legal theories involved. Clifton and Aragon applied this standard to tort recoveries and Curtiss merely quoted Clifton in dicta
 
 
 [13]
 The New Mexico cases cited by the parties considered the application of a New Mexico statute authorizing the recovery of attorneys' fees in worker's compensation cases. Many of the factors are common to all formulae for measuring reasonable fees; others are specific to the worker's compensation statute. See Fryar v. Johnsen, 93 N.M. 485, 601 P.2d 718 (1979); Jennings v. Gabaldon, 97 N.M. 416, 640 P.2d 522 (Ct.App.1982); Johnsen v. Fryar, 96 N.M. 323, 630 P.2d 275 (Ct.App.1980). Certain portions of the latter two decisions were overruled by the New Mexico Supreme Court in Woodson v. Phillips Petroleum Co., 102 N.M. 333, 695 P.2d 483 (1985)
 
 
 [14]
 At the hearing on the attorneys' fees claim, the district court cited four decisions considering awards of attorneys' fees in federal civil rights actions: Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); Ramos v. Lamm, 713 F.2d 546 (10th Cir.1983); Francia v. White, 594 F.2d 778 (10th Cir.1979); and Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir.1974)
 
 
 [15]
 See, e.g., Mares v. Credit Bureau of Raton, 801 F.2d 1197 (10th Cir.1986), where this court considered in painful detail a claim for attorneys' fees under the federal Truth-In-Lending Act, Fair Credit Reporting Act and Fair Debt Collection Practices Act. By one estimate, ninety federal statutes currently include some provisions related to awards of attorneys' fees. R. Aronson, Attorney-Client Fee Arrangements: Regulation and Review 156-62 (Federal Judicial Center 1980). As noted supra, the Miller Act is not one of these statutes
 
 
 [16]
 Naturally, our decision here does not reach those cases where parties are forced to accept such provisions through the exercise of unequal bargaining power. In this case, there is no reason to question the fairness of the provision in the Hugg subcontract
 
 
 [17]
 Based on our interpretation of the Supreme Court's holding in F.D. Rich, discussed supra at 1541, we look initially to federal law for this standard, but note that New Mexico law reviews contractual awards of attorneys fees in an identical fashion and would demand the same result. In McClain Co. v. Page & Wirtz Constr. Co., 102 N.M. 284, 694 P.2d 1349 (1985) the subcontractor brought suit for payment from the general contractor under a construction contract which provided for attorneys' fees for breach by the subcontractor. The trial court found that both parties breached the contract, and refused to award attorneys' fees. The New Mexico Supreme Court affirmed the trial court's decision, citing the same standard--"inequitable and unreasonable"--and two of the federal cases--DeBlasio and Cable Marine --that we rely on. See also Budagher v. Sunnyland Enter., Inc., 90 N.M. 365, 563 P.2d 1158, 1160 (1977) ("It is clearly within the equitable power of the court to consider and reduce an excessive fee."); Robison v. Katz, 94 N.M. 314, 610 P.2d 201, 209 (Ct.App.1980) ("A court may hold void a provision for attorneys' fees in a note or contract where the fees are excessive or oppressive. It is clearly within the equitable power of the court to consider and reduce excessive fees.") (citations omitted). Thus, to the extent that determining the amount of attorneys' fees to be awarded is a matter of substantive contract law, we again decline to decide if federal or state law governs. See supra note 2
 
 
 [18]
 However, in one regard, the trial court's action was clearly erroneous. At the hearing on attorneys' fees, evidence was presented that the reasonable hourly rate for Hugg's two attorneys was $100 and $60 per hour, respectively. Apparently, the trial court adopted these hourly rates as reasonable, because it made no reduction in the hourly fees charged; the court's adjustments all related to the amount of time billed. For the trial, the district court awarded the fees of one attorney for four trial days, or $1200. Assuming that the trial days were only six hours long and no preparation time was billed, the trial court's award equals only $50 per hour. Even if we were to find that the trial court's reduction in time was proper, the monetary award is clearly insufficient and appears to be the product of a mathematical error. On remand, the court should base the award on the hourly fees charged or find those fees unreasonable and excessive to warrant any reduction
 
 
 [19]
 Western argues that a subcontractor may not disregard an express and effective contract and seek recovery in quantum meruit. Brief for Western at 17. Western's argument is correct where both parties complete the contract according to its terms. But that is not the case here. The breach by Western and the work performed outside the contract by CJC allowed the trial court to disregard the "express" contract and award recovery in quantum meruit. See Continental Casualty Co. v. Allsop Lumber Co., 336 F.2d 445, 455-56 (8th Cir.1964), cert. denied, 379 U.S. 968, 85 S.Ct. 662, 13 L.Ed.2d 561 (1965)
 
 
 [20]
 Western argues that no payment was due during August for work performed in July because CJC was late submitting the invoices. Even if this statement is true, it is indisputable that Western owed CJC for July and August work on September 15 and no payment was made
 
 
 [21]
 Western's failure to supervise and the actions which impaired CJC's ability to proceed with the contract work on time may also be characterized as a breach. See United States ex rel Heller Elec. Co. v. William F. Klingensmith, Inc., 670 F.2d 1227, 1230 (D.C.Cir.1982)
 The trial court also found that Western was responsible for engineering, surveying, or staking for the earthwork under the CJC subcontract and that Western's delay in providing those services hindered CJC's ability to perform. Memorandum Opinion at 10-11. We reject Western's challenge to this finding.
 
 
 [22]
 There is considerable difference among courts on this question. See, e.g., NRM Corp. v. Hercules Inc., 758 F.2d 676, 682 (D.C.Cir.1985) ("Generally, interpretation of a facially clear contract is considered a question of law and is for the court."); Marchese v. Shearson Hayden Stone, Inc., 734 F.2d 414, 417 (9th Cir.1984) ("The interpretation of a contract is a mixed question of fact and law."). The standard of review, however, does not determine our decision here because we would agree with the trial court under any standard. Western's interpretation of the contract would place all risks--of delay, or undiscovered errors by Sanchez, etc.--on CJC and it is clear from the record that the parties did not intend such a contract
 
 
 [23]
 Contrary to Western's assertions, CJC's claim is typical of quantum meruit actions under the Miller Act. For example, in Coastal Steel, the subcontractor (Coastal) walked off the construction project when the contractor refused to pay for crane rental. The contractor completed the job with a new subcontractor and Coastal sued. The court found that the contractor's failure to pay was a substantial breach of the contract and that Coastal was entitled to recover the value of its services (approximately 28% of the subcontract was completed by Coastal) under a theory of quantum meruit. Coastal Steel, 479 F.2d at 641. Thus, the trial court's decision here is not unusual, but follows a familiar pattern
 
 
 [24]
 At trial, Western argued that Hugg altered the contract after it was signed to include the staking provision. On appeal, Western argues that even if the contract was not altered, there was no "meeting of the minds" because Western believed that it was altered. Because this issue was not raised at trial, we need not consider it. See Harman v. Diversified Medical Inv. Corp., 524 F.2d 361, 365 (10th Cir.1975), cert. denied, 425 U.S. 951, 96 S.Ct. 1727, 48 L.Ed.2d 195 (1976). Nevertheless, we find the trial court's conclusion is supported by substantial evidence and is not in error